MORRIS J. HAMM, Appellee, v. BETTENDORF AXLE COMPANY, Appellant.

Master and servant: SAFE PLACE TO WORK: LIABILITY FOR ACTS OF
I FELLOW SERVANT. The master is not liable to one servant for the negligence of a fellow servant, especially where they are engaged in the same common employment. Ordinarily his duty in the

first instance is discharged by furnishing a reasonably safe place to work, a sufficient number of competent employees, the necessary appliances and proper materials; but he is under a continuing duty to inspect and keep the place reasonably safe and to establish rules and precautions for doing the work.

**Same:** NEGLIGENCE: DUTY TO WARN: DELEGATION OF DUTY: EVIDENCE. It is the duty of the master to warn an employee of dangers arising out of the progress of the work known to the master but unknown to the employee; and even though the employer is not under obligation to discover danger, still if he is informed of the same his duty to warn and use ordinary care for the safety of an employee arises. And this duty can not be delegated so as to relieve the master from liability for failure to perform the same, but the negligence of a foreman in this respect, in charge of the work, is the negligence of the master.

In this action plaintiff was injured by the fall of a pile of iron or steel plates upon which he was at work, and the evidence shows that the same were so piled as to be likely to fall; and there was testimony to the effect that the foreman directly in charge of plaintiff's work was warned of this fact while the pile was being made but gave the matter no attention, and it is held that the evidence of the foreman's negligence was sufficient to support a verdict for plaintiff.

**Same:** ASSUMPTON OF RISK: BURDEN OF PROOF: INSTRUCTIONS. In an action for injuries to a servant the master has the burden of proving an assumption of the risk growing out of the negligent performance of his duties.

**Appeal:** REVIEW OF EXCEPTIONS NOT ARGUED. Where the exceptions to instructions are not argued and no complaint against them is embodied in appellant's brief they will not be considered on appeal.

*Appeal from Scott District Court.*—HON. A. J. HOUSE, Judge.

WEDNESDAY, MARCH 9, 1910.

ACTION at law to recover damages for injuries received by plaintiff while in defendant's employ due to the fall of iron or steel plates upon him while at work at one of defendant's machines. Trial to a jury, verdict and judgment for plaintiff, and defendant appeals. *Affirmed.*

*T. A. Murphy, Cook & Balluff*, and *A. G. Sampson*, for appellant.

*Ely & Bush*, for appellee.

DEEMER, C. J.—Plaintiff, while employed in what is known as defendant's bolster department, in its factory, at Bettendorf, Iowa, was injured by reason of the fall of a pile of steel plates which had been created or erected by other employees in the prosecution of their work. Plaintiff had been in defendant's employ about a year and a half before receiving his injuries, and was at the time he was injured in the bolster department, where he operated or helped to operate presses which shaped, squared and sheared beams, bolts, bands and plates, bolsters made of "I" beams, plates, rivets, etc., the beams being shaped by machinery, and they have a plate which goes on the bottom of the bolster when completed. These plates are punched by machinery in the bolster department; but the riveting is done elsewhere. When injured, plaintiff was working as a helper on a punching press—a machine used for punching holes in steel plates. The operator of the machine was one Tom Date. Thomas Cain was the foreman of the bolster department, and plaintiff took his orders from this foreman. By direction of the foreman he had been helping Date, and had been so working for about two days prior to his injury. The day before the accident he had been punching plates which were piled about the machine, and, as it had been determined to use a smaller plate, on the next day, Saturday, he and Date began early in the morning changing the dies on the machine. While they were so engaged, other workmen employed in and about the bolster department were bringing in the smaller sized steel plates, and piling them up around and about the machine. The men were instructed about the number to bring in; but were not told how high to pile them. The

plates were so piled that they were about ten feet long
and nine inches wide. There were four tiers piled up from
the ground, and on top of these were three tiers so placed
as to bind the four, and the entire pile was about four
feet high. These plates had been stored out of doors in
the steel yard, and some of them were covered with ice
and snow, sometimes in the form of ridges. 'Others of the
plates were crooked, and the men in piling them used little
blocks or slugs to even them up as they went along.
Because of the presence of the ice and snow and of the
crooked condition of the plates, it is manifest that the
pile was likely to slide and fall, and this is what eventually
happened, to the injury of the plaintiff.

The work of changing the dies was completed about
noon, and immediately after the noon hour plaintiff and
Date began running plates through the press; plaintiff taking
the plates from the pile and feeding them into the machine.
He was taking plates from one of the short tiers on top
of the pile, and had fed twenty or twenty-five into the
machine, when the pile fell while his back was turned,
falling upon him, breaking his leg, and otherwise injuring
him. The plates were piled upon a brick floor, and no
complaint is made of the foundation. The charges of
negligence which the court submitted to the jury were
(1) knowledge of the foreman, Cain, of the unsafe condi-
tion of the pile of plates a sufficient length of time before
the injury to have remedied the defects before the injury
occurred; and (2) failure of the foreman to warn plain-
tiff of the dangers incident to the pile of plates after the
foreman knew or should have known of the condition.

We can best present the plaintiff's theory by here
copying the instructions bearing upon these issues:

(7) It appears that such plates were placed and piled
by the plaintiff's coemployees, whose negligence, if any, in
so doing, was assumed by plaintiff when entering such em-
ployment. If, therefore, you find such plates as piled

were not reasonably safe, such condition under the law would be considered the result of the negligence of such coemployees, and as such was assumed by plaintiff, and hence defendant would not be responsible therefor; but if the defendant through its foreman knew, or had reasonable grounds to know, of such unsafe condition, and had such knowledge a sufficient length of time before the accident resulting in the injury to plaintiff to have prevented the injury to plaintiff while acting in the exercise of reasonable care and prudence to protect its employees from injury, then it was its duty to so do.

(9) The second ground of negligence is that the defendant failed to warn plaintiff of the condition of such pile of plates and the risks and dangers thereof. The duty to warn the plaintiff did not arise unless the defendant knew, or had reasonable ground to knew, that such pile of plates was then unsafe, and not then unless the defendant had reasonable grounds to know that the plaintiff was ignorant, not only of the condition of such plates, but the risks incident thereto. Hence, if you fail to find that the defendant had reasonable grounds to believe that the plaintiff was ignorant of the condition of such plates, or fail to find that the plaintiff did not know of the risks and dangers therefrom, or fail to find that such pile of plates was unsafe, or fail to find that the defendant knew that such plates were unsafe, if so, then in either of such events the duty to warn plaintiff did not arise, and in such case the defendant can not be held to have been negligent in failing to warn the plaintiff of the condition of such plates and of the dangers, if any, arising therefrom. But if you find that such pile of plates were not in reasonably safe condition, and that the defendant knew thereof, and knew that by reason thereof it was dangerous, and had reason to know that the plaintiff did not know thereof and would not discover such danger while in the exercise of reasonable care and prudence to prevent injury to himself, and further find that defendant knew of such matters in time that by the exercise of reasonable care and prudence to warn plaintiff thereof and thus avoid injury therefrom to plaintiff, then on your so finding you would be warranted in finding that defendant was negligent in failing to warn the plaintiff of such dangers.

The fundamental proposition relied upon by defendant for reversal is that no actionable negligence of the defendant is either pleaded or proved. It is contended that the negligence of plaintiffs' fellow servants in piling and handling the plates was one of the risks which he, plaintiff, assumed when he entered defendant's employment; that the bringing in and piling of the plates for use at the machine was a necessary incident of the work; and that the negligence, if any, with reference to the handling of the plates, was that of fellow servants, for whose acts defendant was not responsible. These, of, course, are elementary principles of the law of master and servant, and, if this were the entire case, we would have no difficulty in sustaining the appeal by reversing the judgment. But it will be noticed that the negligence charged was that of the foreman, Cain, who it is claimed was the *alter ego* of the defendant, and that for his acts either of omission or commission defendant was responsible. It is also contended that the acts of negligence charged against Cain were nondelegable in character, in that it was his duty to see that the place where plaintiff worked was safe and kept safe for him during the progress of the work; that it was his duty to observe the condition and to warn and protect him from dangers arising out of the negligence of coemployees.

It is hornbook law that a master is not liable to one servant for the negligence of a fellow servant, especially where they are engaged in the same common employment. The master has ordinarily fulfilled his duty in this respect when he has furnished his employee with a reasonably safe place to work, has supplied a sufficient number of competent servants, and the necessary appliances and proper materials. He ordinarily is not expected to be present at all times to see to the conduct of the work; for having supplied the necessary number of reasonably com-

1. MASTER AND SERVANT: safe place to work: liability for acts of fellow servant.

petent servants, and the necessary appliances and materials, he may reasonably assume that the work will be properly done. However, he is under a continuing duty of inspection to keep the place in a reasonably safe condition for work, of establishing rules for the conduct of the work, and of formulating reasonable rules and precautions for the doing of the work. Whether or not defendant was responsible for the acts and conduct of the foreman, Cain, is a mixed question of law and fact, and for the solution thereof we must first go to the testimony. There can be no doubt under the evidence that the plates were so piled as to be likely to fall, and there is testimony to the effect that Cain was warned of this while the pile was being made, and that he told the employee making the complaint to mind his own business.

Cain testified with reference to this as follows:

I told the men what work to do and what work not to do, and discharged men if I had reason to do so and saw fit in my department. The men in that department were subject to my orders as to their work there, and I instructed them what to do and gave them any instructions as to how to do it. That was my duty. I had general charge of the department. Generally, if there was anything wrong in that department, it was reported to me by the men in the department. If it was something that I could fix, I would go ahead and fix it, or have it fixed. As far as my work went, it was my duty to have supervision over that department, and see that things were in the shape that they should be. Hamm was under my direction at that time, and I told him to go and help Tom at that machine. I knew he would do what I told him to. I knew these men were hauling plates and piling them up right there where they were piled. I was around that department watching the work and seeing that things were going the way they ought to. . . . If Varner and any of these fellows that was working there saw something that was piled up there in a dangerous manner, it was their business to tell me and my business to fix it. It was my

business to be there and generally oversee and supervise
the work. It was my business to get that material and get
it shaped up and put in the shape of these bolsters. That
is my department, and my instructions or schedule are
simply to get out so much work, and I get out so much
work. The details of it, that is my business to attend to.

He also testified with reference to the plates as follows:

I knew these men were hauling plates and piling
them right up there where they piled them. I told their
foreman to send those plates in, and have them piled by
those machines. I knew these plates were coming in from
outdoors. I knew that sometimes these plates had snow
or ice on them. I saw these men piling up these plates
alongside of that machine. I knew it was cold weather.
I knew there had been sleet and snow during the winter.
I knew generally that if there was snow and ice, if it was
cold weather and they were out of doors, it would freeze
on the plates. I noticed how high they were piling them
before the accident happened.

Other witnesses testified regarding the piling of the
plates as follows:

The plates we took in there were small plates about
nine or twelve feet long and about ten inches wide. I can
not remember how thick. When we brought these plates
into the shop, there was ice and snow on a portion of them.
On some of them there were ridges of ice and snow, more
or less. . . . I have helped bring in material that
had ice and snow on it before this. In the winter time,
when there comes snow or rain and it is freezing, it sticks
to the plates. I worked there nearly three winters. During
all that time plates have been stored outdoors. When plates
were stored outdoors in the winter, there might be snow
or ice on them when I brought them into the shop. This
had been true during the three years I worked there. I
never received any instructions about putting in crosspieces
or as to removing snow or ice. Snow and ice gets on the
plates from bad weather. The effect that has on the
plates when piled up in the shop is that they slide easily,

easily fall over. I had been piling up plates that had ice and snow on them pretty nearly three winters. After these plates were piled, they were standing straight. They were standing good. These plates were stored in the yard. They were piled one on top of another plate. All the ice there would be on them would be what could run between, and that would be only a thin sheet of ice. When they were piled in the yard, there was little pieces used there in making up the pile. In piling plates there would easily be some crooked ones that we would have to block a little. Sometimes, when the plates were crooked, we slipped one of those slugs in, and sometimes used little blocks of wood about half an inch thick, and sometimes a quarter of an inch and sometimes an inch. I used little blocks like that during all the time I piled plates there. I do not think there was ice on every plate, but there was on a good many. In the winter time there would be ice on most of them. This ice would be just a thin sheet wherever the plate happened to be crooked and standing apart, so that the water could run between. In taking plates off the pile out in the yard, they would be frozen together, and we would have to break them apart. We would take a hammer and knock them. I think we piled these plates between forty and forty-five inches high that morning. That is the whole pile. No matter what the reason for that unevenness, whether it was the bending of the plate or the ice, we put a block in there to even it up. If a bent plate lies on another one in a pile in the yard, it leaves a hollow space under the bent plate. If the snow and ice would run right in there under this hollow plate, it would form on the plate below it. When we hauled these plates into the shop, we didn't put them back on the pile just in the order they were taken off the other pile. In piling those plates there when you would come to a plate where for some reason a plate would not lie level, we would put a piece of wood or one of those pieces of iron under it and level it. That is the way we piled those at Hamm's machine that morning.

There was ice on the plates we took off Mr. Hamm. It was kind of thin sheets and chunks in other places. This ice was from a quarter of an inch thick down to very thin. The plates were wet from the melting of the ice.

This ice was frozen fast to the plates. After the pile fell over, there was still ice frozen to the plates.

The plates that were used there at the plant were stored out in the yard at the east end. There was no cover over them. I had seen ice on plates that they used there. When the plates commenced to thaw, they were slippery. The plates that had fallen on Hamm were icy, and some of them were bent a trifle. In some places there was no ice on. It was different thicknesses. With these plates piled in that way, I suppose the ice would melt first where the heat hit it first from the outside. There was ice on the plates that fell. That was still on the plates after the plates fell down, and was frozen fast to the plates.

From this it appears that Cain had charge of the department, that it was his duty to see that everything was going right, and that, if he saw anything in a dangerous condition, it was his duty to fix it. Plain-tiff, Hamm, had never worked about this machine, save for a few days before he was hurt, and, when the plates were being piled, he was at work changing the dies upon the machine with his back to the pile of plates which was being made by other workmen. The pile was left straight and apparently plumb, and there was nothing in its outward appearance which suggested any dangers. Cain was informed as to conditions and was warned of the danger of the pile due to the presence of snow and ice; but he did not warn plaintiff nor did he do anything to eradicate the dangers. These facts bring the case within the rule of *Rigsby v. Supply Co.,* 108 S. W. 1128; *Newcastle v. Doughty,* 168 Ind. 259 (79 N. E. 485); *Smith v. Lidgerwood,* 56 App. Div. 528 (67 N. Y. Supp. 533); *Kerker v. Bettendorf Co.,* 140 Iowa, 209; *Beresford v. Coal Co.,* 124 Iowa, 34; *Foley v. Packing Co.,* 119 Iowa, 225; *Clark v. Telephone Co.,* 146 Iowa, 428; *Rodgers v. Lumber Co.* (Or.) 102 Pac. 601 (103 Pac. 514); *Long v. Telephone Co.,* 134 Iowa, 336; *Halwas v. Granite Co.* (Wis.) 123 N. W. 789;

*2. SAME: negligence: duty to warn: delegation of duty: evidence.*

*Meagher v. Machinery Co.*, 187 Mass. 586 (73 N. E. 853); *Indianapolis Co. v. Wachstetter* (Ind. App.) 88 N. E. 853. These cases all proceed upon the theory that it is the duty of a master to warn its employees of dangers arising out of the progress of the work known to it but unknown to the employee. This duty arises out of the obligation to furnish the employee a reasonably safe place to work and to use reasonable care to keep it in a safe condition. Even if the employer were not obliged to discover the danger, still, if he is informed or is' aware thereof, it is his duty to warn other employees and to use ordinary and reasonable care for their safety. In *Brann v. Railroad,* 53 Iowa, 595, it is said: "As the corporation must act through agents and employees, the negligence of the employee upon whom the duty of inspection is devolved is the negligence of the corporation. The brakemen on freight trains and such inspector can not be regarded as coemployees in such sense as to prevent the former from recovering of the corporation because of the negligence of the latter."

The rule governing such cases as this is well stated in 1 Labatt, Master & Servant, section 29. This section reads as follows: "Where the abnormal conditions which caused the injury are shown to have been originally produced by a cause for which the master was not responsible, the action is or is not maintainable according as it may appear that he was or was not guilty of a subsequent and distinct breach of duty in having failed to ascertain the existence of those conditions, or in having omitted after discovering them to take such steps as might be appropriate for the protection of his servants. This principle is applicable whether the abnormal conditions result from the act of a stranger or a fellow servant, who is not a vice principal." In *Kerker's* case, *supra,* we said: "Where an employer knows the danger to which his servant will be exposed in the performance of any labor to which he assigns him and

does not give him sufficient and reasonable knowledge thereof, its danger not being obvious, and the servant without negligence on his part, through inexperience or through reliance on the direction given, fails to perceive and understand the risk and is injured, the employer is responsible." And in *Beresford's* case, *supra,* we said: "The duties for which a master can not escape liability by delegating their performance to his agents or servants . . . include the obligation of furnishing the servant with a safe place to work, . . . to give the servant timely warning of dangers which are known, or ought to be known, to the master, but are neither known nor patent to the servant, . . . to exercise such discretion, supervision and control over the work as may be required to carry on the same with reasonable safety to all employees therein." Again in *Clark's* case, *supra,* we said: "In a general way it is contended that the obligation of defendant to furnish plaintiff a safe place to work did not exist in this case because the place plaintiff was working in was rendered unsafe in the very employment in which plaintiff was engaged. In other words, that the work of repair in which plaintiff was engaged necessarily involved dangers of which he was charged with knowledge. The well-settled principle involved, however, did not, as we think, relieve defendant from liability if its foreman directed the plaintiff to work under conditions which were to his knowledge, as a reasonably prudent man, particularly dangerous on account of the failure of defendant to take precautions as to the prosecution of the work which a reasonably prudent employer would have taken for the safety of his employees."

The cases relied upon by appellants' counsel announce no contrary doctrine. They adhere to and affirm general principles already announced in this opinion, and do not apply to a case where a foreman in charge of a department whose duty it is to keep things straight, to watch the work,

and to fix anything which might become unsafe. These duties on the part of the foreman in charge of a department are nondelegable in character, and the negligence of such foreman is the negligence of the master. Of course, it is not the rank or grade of employment which determines the character of the service, but the nature of the duty to be performed which gives color to the employee's act. The duty to inspect or to warn is masterial in character, and, as we have already said, can not be delegated. We have already pointed out this distinction in many cases, as will be observed by reference to the following: *Jacobson v. U. S. Gypsum Co.,* 144 Iowa, 1; *Hendrickson v. Gypsum Co.,* 133 Iowa, 89; *Schminkey v. Sinclair Co.,* 137 Iowa, 130; *Streicher v. Davenport Co.* (Iowa), 124 N. W., 327. See also, *Anderson v. Pittsburgh Co.,* 108 Minn. 455 (122 N. W. 794).

II. Of the instructions complained of we shall note but one. It reads as follows:

(12) If the condition of such plates or their liability to fall was apparent, or if by casual observation the plaintiff as a reasonable, careful and prudent person would have known of the condition of such plates, and as such a person would have appreciated the dangers arising therefrom, then you will be warranted in finding the plaintiff assumed the risks and dangers, and, if you so find, you should return a verdict for defendant.

3. SAME: assumption of risk: burden of proof: instructions.

On the other hand, if you fail to find that the defendant as a reasonable man did not, and was not bound to, appreciate the risks and dangers incident to the then condition of such plates, then he can not properly be held to have assumed the risks and dangers, if any, arising therefrom.

In the last paragraph of this instruction the trial court used the word "defendant" instead of the word "plaintiff" as intended. Substituting the word "plaintiff" for "defendant," still the instruction is not clear, although

the thought which the court intended to express is apparent
to the legal mind.  What the court intended to state was
that, if plaintiff as a reasonably prudent man did not and
was not bound to appreciate the risks and dangers incident
to the condition of the plates, then he could not properly
be held to have assumed the risk.  Attempt was made to
shift the burden upon plaintiff of showing that he did not
know of or was not bound to appreciate the risks and
dangers incident to the piling of the plates, although this
was very clumsily done.  Instruction 11 should be read in
connection with No. 12.  It is in this language:  "(11)
In entering the employment of the defendant the plaintiff
assumed the risks and dangers incident to the work in
which he engaged, including such as arise from unsafe
conditions created through the negligence of his coemployees
as hereinbefore stated, but he did not assume the risks and
dangers arising from the negligence of the defendant, if
any.  The defendant alleges that the plaintiff knew of the
condition of such pile of plates, and that he appreciated
the dangers arising from its then condition.  If you find
such alleged facts established by the evidence, then the
plaintiff must be held to have assumed the dangers incident
to such plates as piled, and this, although you find the
defendant was negligent in either or both of the particulars
charged."  The assumption of risk here referred to was not
that growing out of a proper performance of the work by
the defendant, but out of the negligent performance of
its duties, and the burden of proving the assumption of
such risk is upon the defendant, so that, even if the instruc-
tion had been given in the form the court intended, it
would have been erroneous insofar as it applied to the
burden of proof.  *Mayes v. Railroad,* 63 Iowa, 562; *Wells
v. Railroad,* 56 Iowa, 520.  The paragraph complained
of aside from this question of burden of proof was intended
to be in plaintiff's favor, stating the other side of the
proposition already given in the first paragraph of the

instruction, and, as it was intended for plaintiff's benefit, no harm resulted. The first paragraph, which is clear, covered the case from defendant's standpoint, and in it there was no error. The latter paragraph, being at most unintelligible and meaning nothing, could not have prejudiced the defendant, for it had the benefit of all it was entitled to in this connection. The paragraph complained of is erroneous because not intelligible; but we are of opinion that no prejudice would have resulted to defendant therefrom. There is one other way the instruction might be interpreted if we substitute the word plaintiff for defendant, and that is that if the jury could not say that plaintiff did not and was not bound to appreciate the risks and dangers, etc., then he could not be held to have assumed the risk. Remembering that the burden was upon defendant on this issue, the instruction so read would not be erroneous. No matter what the construction, we are abidingly satisfied that defendant suffered no prejudice therefrom.

III. So little reliance is placed upon exceptions to other instructions that defendant's counsel has failed to argue them or to embody any complaints against them in its points and propositions relied upon for a reversal. For this reason, we are not called upon to consider these exceptions.

4. APPEAL: review of exceptions not argued.

Finding no prejudicial error, the judgment must be, and it is, *affirmed*.