J. P. HERR, Administrator of the Estate of JOHN P. HERR, JR., Deceased, Appellant, v. J. A. GREEN.

Master and servant: NEGLIGENCE: EVIDENCE. In this action for the death of an employee the evidence is held to require submission of the question of defendant's negligence in ordering decedent to work in a place of peril, in failing to warn him of the danger and to provide suitable tools.

Same: CONTRIBUTORY NEGLIGENCE. An employee is not guilty of contributory negligence in obeying the order of a superior, unless in doing so the danger is so apparent that no ordinarily prudent person would attempt it of his own volition. In this action the evidence is held to present an issue for the jury as to the negligence of decedent in obeying an order to loosen a rock at the ledge of a quarry.

Appeal: REVIEWABLE QUESTION. The appellant court must determine a case on the record as presented, it will not express an opinion as to whether omitted facts would lead to a different conclusion.

*Appeal from Jones District Court.*—HON. F. O. ELLISON, JUDGE.

THURSDAY, MAY 16, 1912.

ACTION for damages resulted in a directed verdict for defendant and judgment thereon. The plaintiff appeals.— *Reversed.*

*F. H. Randall, Barnes & Chamberlain,* and *Grimm & Trewin,* for appellant.

*Redmond & Stewart,* for appellee.

LADD, J.—The plaintiff's decedent, John P. Herr, was employed in defendant's stone quarry and, after working there breaking and loading stone, drilling holes, and the like six or eight weeks, was directed on the 16th day of June, 1908, by the superintendent, acting as vice principal, to take a crowbar, go to the top of the quarry, and remove a rock. When doing so, the rock with stone near by fell and, carrying Herr down, crushed him to death. The petition alleged that he did not contribute thereto by his own fault and that defendant was negligent in directing the deceased, an inexperienced youth twenty-one years old, to do work which was very dangerous and which should have been done by an experienced quarry man, in not warning the deceased of the danger in connection with the work he was directed to do, in not stripping the rock back far enough so as to furnish deceased a proper and safe place to stand while doing the work, in directing the deceased to use a short crowbar for said work in the use of which it was necessary for the deceased to get close to the said loosened rock and earth and in a position of extreme danger.

At the close of plaintiff's evidence, a verdict on motion was directed for defendant, and the sole inquiry is whether the record was such that the issues ought to have gone to the jury. For this reason, the facts necessarily are recited at considerable length. The face of the quarry was nearly perpendicular and semicircular in form. From the surface to the bottom was about fifty feet, but ten or twelve feet of dirt was stripped before stone was reached, and this had been done fifty feet back. Three holes had been drilled down to the bottom twenty or twenty-five feet apart in February, 1909, and loaded with blasting powder. When these were fired, "the result left the rock hanging there, kicked out the bottom, kind of caved back, and left this hanging there as a shelf. It was nineteen feet from where this cave-off started to the top of the surface. Nothing was done with

1. MASTER AND SERVANT: negligence: evidence.

hanging top until June 15th, when the holes were loaded over. The holes were reloaded by plugging up the bottom. Before they were plugged, you could see clear down through to the bottom."

The defendant and Cook, whose testimony we have quoted, did this, and, when shot off, the explosion was out, the top heaving the rock up covering the surface several feet around, and shortly afterwards "the whole thing dropped right from the top, leaving a little ledge in front. In other words, this explosion blew up, breaking but a little on the top of the surface, and eight or ten minutes afterwards the surface for ten feet or more went down leaving a little bench in front, just a little bench across the top of the quarry, bound in from the two corners; was from one side to the other, nothing on the bottom at all and nothing over the top. The dimension of the ledge was eight or ten feet long and two feet thick, and I judge three feet wide, maybe more. The sides of the cliff were jagged like an explosion. Mr. Green wanted to know if it was dangerous for men to work under this bench. I said, 'yes.' He wanted to take it; he came up to take it—didn't have any man but Mike Shannon. I told him Mike Shannon was the man to come up and take it. He said they didn't have any men they could send up there; said they didn't hardly have a man to go up and get that down but Mike Shannon."

The rock extended across like a bridge, and back of it there was an open space of several inches. The defendant told the foreman to send a man up to assist him, and decedent was directed to do so. He took the necessary tools and with defendant undertook to prepare a place to stand, as the ground slanted upward from the rock at about half pitch, and decedent also "drilled a hole in the rock." The next morning Shannon fired two blasts in this hole without apparent effect. The superintendent Mittenberg then directed decedent who was breaking rock to take a

crowbar, go up and see what he could do with the rock; as testified by Coddling or as related by Mittenberg, the latter said, "Phil, you go up there, take your bar again, you work along there again, try your best, and now you look out." Decedent went up accordingly, and, as the super-intendent testified, after working about a half hour, was cautioned by him from below, "Phil, now don't get too fresh up there," as he was getting near the edge, and Phil answered, "He know what he do." This witness also testi-fied that defendant had called his attention to the stone and had said it was dangerous, but that the witness con-sidered it safe back of the' stone, that he "sent Phil up to try to get more opening on behind there to pry it down from behind" and told him, "You know, Phil, pretty near as good as I can tell you, you watch out," that he told him three times to be careful when he would step one foot "too far out," that he stood with one foot on the keystone and the other on the bank when the fall occurred, and this was dangerous, but he could have safely stood on the bank.

Coddling testified that decedent was "pretty well over the south side, standing there, when he got dropped. There had been a hole opened up behind there, could not stand on the bank; it was at the south side of the ledge. He stood facing the quarry. At the time the rock fell he was just standing there looking down to see what was going to be done, what to do with the rock in between the two arches there; then the lower one fell or dropped, and pretty soon the other went down. He was standing on the ledge pretty close to the top. From where I stood Herr appeared to be standing back from the front of the ledge so he wouldn't fall off in front, back pretty well, as far as he could handy, I suppose. I did not see him pry or loosen the rock at all. This big rock was apparently in two layers, pretty near the center, and pretty soon standing up there a short time the lower half fell—dropped; in two or three seconds the other half dropped on top of it. Q. Did that allow the

wing rock to fall—pull it over—too? A. Just as soon as the keyrock dropped they fell down, the two sides came down too. Q. State to the jury how much of the arch fell over to the sides of the bank? A. Back to here, both sides. Q. The top dropped, where he was standing—fell? A. Yes. Q. If he had been standing back two or three feet further, did enough of the rock fall so it would have taken him with it? A. That corner all came down, that edge, both corners came down when this rock fell. . . . Herr was standing where the cross (X) is, with a little bar in his hand, viewing the rock, as though looking to see, when the lower part dropped out. He went straight down feet first, and was killed, crushed with the rock that came down." This witness testified that the rock extended across like a bridge, and illustrated its location by a sketch:

The line A represents the face of the quarry; B, the rock, and C c the arch of stone supporting it, and X where the decedent stood immediately before falling.

Cook, after testifying to conditions after the blasts were fired on the 15th of June, proceeded: "Q. Now was there any place—state whether or not there was any space left, any place on this ledge to stand and work after this explosion? A. On the arch? Q. Yes. A. I would not think so. Q. Do you know whether there was or not? A. No; I wouldn't want to go out there myself. Q. Was there any place to stand and not stand on this arch? A. Yes, sir. Q. Where was it? A. The whole top of the quarry to stand on. Q. No other place, that is, between where the arch

joined onto the cliff and the cliff? A. Yes; the top of the cliff, a place there, cleaned off, would have had a place to stand."

There was evidence that the crowbar was not suitable for such purpose and that when the keystone fell several car load of rock fell with it, and also that decedent had, when about twelve or fourteen years of age, given signals to the engineer in hoisting rock in another quarry near which he lived six years and was waterboy for a time. The recital of facts leaves little or no doubt as to the dangerous character of the place. The explosions of blasting powder on the day before had left the rock hanging twenty or twenty-five feet above the bottom of the quarry as testified by one witness, or forty feet as estimated by another, and back of it the earth slanted upward five or six feet so steeply as to render it necessary to excavate in order to get a foothold. A hole in this rock had been twice charged and "shot off" shortly before decedent was ordered to "see what he could do with the rock." Cook, who had worked in the quarry ten years, testified that he had "never seen an arch pressing in this way; most generally is likely to shove off the top on operating the shot" at any time; and defendant seemed to think Shannon, who handled the powder and was of long experience, the only employee competent to remove the rock. The superintendent thought the place dangerous unless decedent remained away from the rock he was sent up to remove, which was difficult to do and accomplish what he was attempting. That it was a place of unusual peril, and that this was well known to Mittenberg, who was vice principal, in ordering decedent there to see what he could do about the rock, the jury might have found, and therefore that decedent's death was caused by defendant's negligence. See decisions hereafter cited.

So, too, the jury might have concluded that decedent was inexperienced in the kind of work required of him. He had been about another quarry as a boy twelve or

fourteen years of age carrying water and signaling the engineer when to hoist stone from the pit, but aside from this does not appear to have acquired greater knowledge than that which he must have obtained in breaking and loading stone and drilling holes during the six or eight weeks in the quarry of defendant. True, he said to the superintendent when employed that he could do whatever might be required, but this had reference to the usual work about the quarry and can not fairly be construed as relating to an extraordinary and unusual situation like that under consideration. Of course he is presumed to have understood generally the laws of gravitation and to have known that if he fell he would be injured and that in prying the stone he should avoid losing his balance when it fell. But he was not bound to know that when the stone fell it would likely carry with it the earth and stone several feet back as it did and take him along, even though standing as far back as he could in using a crowbar six or eight feet long. Moreover, he was impliedly assured by the order to go up there and see what he could do about the stone that this might be done safely, and for this reason his representative ought not to be denied a remedy against the defendant on the ground of contributory negligence unless the danger was so glaring that no prudent man would have entered into it even though not entirely free to choose.

2. SAME: contributory negligence.

The servant's duty is that of obedience, and when acting under an express order of the master or, what is the same, of one acting in his stead, he assumes no risk unless he fails to exercise ordinary care in obeying it. Whether decedent acted as an ordinarily prudent person would in a like situation was an issue of fact to be determined by the jury. *Hardy v. Railway*, 149 Iowa, 41; *Steele Co. v. Schymanowski*, 162 Ill. 447 (44 N. E. 876); *Chicago Anderson Pressed Brick Co. v. Sobkowiak*, 148 Ill. 573 (36 N. E. 572); *Shortel v. City of St. Joseph*, 104 Mo.

114 (16 S. W. 397, 24 Am. St. Rep. 317); *Stephens v. Railway,* 96 Mo. 207 (9 S. W. 589, 9 Am. St. Rep. 336); *Northern Pac. R. Co. v. Egeland,* 163 U. S. 93 (16 Sup. Ct. 975, 41 L. Ed. 82); *Cable v. Railway,* 122 N. C. 899 (29 S. E. 377); *City of Lebanon v. McCoy,* 12 Ind. App. 500 (40 N. E. 700); *East Tennessee, V. & G. R. Co. v. Bridges,* 92 Ga. 399 (17 S. E. 645); *Thompson v. Railway* (C. C.) 14 Fed. 565; 4 Thompson, Neg. section 3809.

We are of the opinion that the evidence was such as to carry the issue as to whether decedent was negligent in undertaking to obey Mittenberg's order, as well as whether defendant was negligent in that such order was given to the jury, and that the court erred in directing a verdict for the defendant.—*Reversed.*

## SUPPLEMENTAL OPINION.

### MONDAY, OCTOBER 21, 1912.

PER CURIAM.—Counsel in the petition for rehearing, as well as in oral argument, seem to have overlooked the fact that the decision in this case was necessarily based on abstracts filed with the clerk of this court. As to whether evidence omitted therefrom might have led to a different conclusion we express no opinion.—The petition is—*Overruled.*

3. APPEAL: reviewable question.