WILLIAM JOHNSON v. CORN PRODUCTS REFINING COMPANY, a Corporation, Appellant.

**Master and servant:** NEGLIGENCE: PROXIMATE CAUSE: EVIDENCE. Where an injury may have been caused in several different ways and one is as probable as the other no recovery can be had. The facts supporting the theory relied upon must be of such a nature, and so related to each other, that no other logical conclusion can fairly and reasonably be drawn from them. In this action the evidence is held sufficient to take the question of whether plaintiff was injured by the falling of sand and dirt upon him from a pilaster near which he was excavating to the jury.

**Same:** SAFE PLACE TO WORK: EVIDENCE. The evidence in this case is held to require submission of the question of defendant's negligence in failing to make the pit in which plaintiff was employed a safe place to work, by properly lighting it and guarding against falling sand and dirt.

**Same:** ASSUMPTION OF RISK. Where plaintiff knew nothing of the danger and proceeded with his work of excavating as directed, which did not apparently undermine the pilaster that crumbled and injured him, he was justified in assuming that the excavation could be done in safety.

**Same:** SUBMISSION OF ISSUES: PREJUDICE. No prejudice to the defendant resulted in this case by copying the pleadings, alleging several grounds of neglience, into the instructions; as the court thereafter clearly defined the issues and limited consideration by the jury to certain specific grounds of negligence actually submitted.

**Same:** INSTRUCTIONS: NEGLIGENCE OF AGENT. An instruction that the negligence of defendant's corporate officers or agents was that of the corporation, and that its foreman was an officer, and any negligence of his was imputable to it, was inaccurate in describing the foreman as an officer, and in making any negligence on his part imputable to the corporation, in the absence of a showing that he was a vice-principal; still it was not prejudicial where the duties resting upon the foreman were those of the master relating to the safety of an employee.

*Appeal from Scott District Court.*—HON. L. J. HORAN,
Judge.

WEDNESDAY, NOVEMBER 20, 1912.

ACTION for damages resulted in judgment against
defendant, from which it appeals.—*Affirmed.*

*Lane & Waterman,* for appellant.

*Walter H. Peterson* and *Bolinger & Block,* for ap-
pellee.

LADD, J.—I.  The defendant is a manufacturer of
edible products from corn, and plaintiff was in its em-
ployment as a common laborer.  Prior thereto he had
worked in car construction and repair shops, and at ex-
cavating for and laying sewers and tile.  He had been
working for defendant in the "roustabout gang," of which
one Lane was foreman, for some time, when required by
the foreman to go to the blacksmith shop.  This shop
was about eighteen feet square with a wooden floor about
three feet above a granitoid floor six inches thick.  The
defendant, for some purpose in relation to the foundation,
had caused a pit to be excavated beneath this shop about
eleven feet deep, measuring from the wood floor, and
therein a pillar of dirt or sand covered with granitoid had
been left as a sort of platform onto which the dirt from
the bottom could be thrown, and then taken by a man on
top of the pillar, and thrown through a hole in the wood
floor about two feet square.  The excavation is more par-
ticularly described by plaintiff, and, as the right to recover
at all is challenged, his testimony with respect thereto and
of how the injury was received may be set out somewhat
fully.

The excavation had been there before that day about

a week. I did not have anything to do with the excavating or the digging of this trench or hole. There was a space cut off of the outside wall in the neighborhood of three and one-half feet wide, running back eight feet, and then north eight feet to the main wall of the steephouse. Then take it over in this side, we will say four feet, and there was another cut-off made. It ran to the bottom and then this strip here in the main wall of the steephouse was to be dug out so as to allow the masons to work on the floor of this cement foundation, and this space in here, along next the main foundation, was to be opened in order to give the masons a chance to lower the main foundation to the bottom of this pillar. And they left a pillar in the neighborhood of three and one-half or four feet square at the top that went to the bottom, standing there unprotected. It was about the same size at the bottom as at the top. A little bit wider at the bottom, probably a few inches. On the top of this pillar it was granitoid about six inches through. That granitoid covered pretty nearly the entire top. There was a three-cornered point right across the corner from the square that was unprotected with granitoid. The granitoid had been taken off it. The pillar was left for the purpose of throwing the material out of this excavation on top to enable the men to get through the floor to get it outside where it could be disposed of. On the day I was hurt before I went into this excavation I had been cleaning up inside of the building. I had nothing to do with excavating or digging in the hole before that day. I had never been in that hole. I had never seen it before. . . . Mr. Lane came to me in the afternoon around about four o'clock, and he was pretty well cleaned up on the inside, and he asked me to go with him to the blacksmith shop, and we went there, and he put me down on top of this granitoid to help the other fellow to throw up the dirt, because being so low that a man couldn't shovel only a few shovels until he would have to crawl out of it. I got into the hole by going over to this corner where the trapdoor is, and getting down on this granitoid and crawl through underneath. I crawled as far as the hole in the wooden floor. At this time there was a man down in the hole when I crawled in. He was shoveling dirt up onto this pier. At that time I was staying back to one side of the place, and there was another

man shoveling. I was waiting until he got tired and came up, so as to make a change. I threw dirt through this little hole. They had one extension light with two lights on is all they had. That was hanging over the rafters, over to one side of the excavation. The lights were not directly over the hole. They were just to one side. To a certain extent they were thrown in, but not sufficient force in them to give a person a clear sight. It was just light enough so you could see to work, and that was all. There were two lights on one extension. I should judge the lights were probably sixteen candle power. They had glossed over with dirt. You could hardly see through them. . . . When I went to the hole, I did not know what the pillar and walls were made of. I was on top of the pillar about half an hour. I went down in the hole because I was required by the foreman Mr. Lane. . . . The other man that was down there came up. I took his place. I did not take my shovel. There were shovels already in the pit. When I got down there, it was betwixt and between dark and light in the hole. It was light enough to work, but not to see what kind of material. I could not see what kind this material was when I got down. I was hurt as near as I can judge about fifteen or twenty minutes after I got down. After I got down, I went ahead as I was directed. There was a little piece of dirt laying in the main wall of the steephouse that was to be removed. It was in the neighborhood—we will say it was sixteen inches wide, a strip remaining of the pier that goes to the bottom, to give the room for the masons to work under this main wall. It was an addition to the pillar. It was not a part of the pillar. It was fastened on to the pillar on one side. It was cleared out so as to give the masons a chance to work on the main foundation, the main wall. We had already removed that. I started to remove that little piece that was along this main wall. It was attached on up against the main wall of the steephouse. It was an addition to the pillar, but then it was at the bottom. I did not at any time dig any dirt in under this pillar. I did not take any dirt off the pillar at all. I was working from the foundation or underneath the main foundation for to give room for the mason to extend that foundation. I did not remove any dirt from the pillar. As to what happened when I started

to remove this dirt, well, I was bent over shoveling straightening up the back part underneath this pier or main foundation when the fall got me. Q. What was it that fell on you? A. I don't know. I was standing with my right side to the pillar. As near as I can get it, I was facing east. There was a foundation down there, part of the way down of the steephouse. I was working near that foundation. I suppose the foundation was made of brick and mortar, but I don't know. It might have been made of concrete, but the piers that were put in there were made of brick. I couldn't see what any of this was made of when I went down there. Q. Now, what effect did this caving in or falling have on you, Mr. Johnson? What happened to you then? A. I don't know. I didn't know anything until after I was taken to the office.

Upon being recalled, after defendant had moved for a directed verdict, plaintiff testified further:

I was bending over, shoveling. I was probably eight or ten inches from the pillar. Q. And then what happened? A. And then there was—I noticed there was a squeeze that turned me half around. Q. What do you mean by 'squeeze?' A. A caving. A caving of sand or dirt or some kind of soft material. Q. What happened then? A. Then I didn't know anything more until I came into the office. Q. Did you notice anything falling on you? A. No; just nothing only what fell at that slide. Q. Just describe what fell on you. What did it feel like, would you say? A. It was either dirt or sand or some soft material. At that time I couldn't tell. Q. How do you know that? A. Because it caught me around above the waist here, and buried me that deep [indicating]. I remember that. This fall came from the right side. It came from the south. It came from the pier, and then I lost consciousness. Q. Did I understand you to say you felt yourself being buried? What do you mean? I don't understand. A. Yes. I felt myself being buried by some soft material that closed in around. It struck me first on the shoulder here. Q. State whether or not you lost consciousness immediately. A. I didn't know at the time that they took me out at all. Q. But you felt yourself being buried by something? A. Yes, sir.

On cross-examination:

When you were asked this morning the plain simple question what was it that struck you and hurt you, and said 'I don't know'— A. Well, I don't know yet.   Q. What have you been saying then—that sand and dirt came down and buried you?  A. I just said that it seemed to me that was.   Q. You don't mean now that you know anything about what it was, do you?  A. I am not positive, no; but then I say it seemed to me as it came around me and buried me up.   Q. You said this morning you lost consciousness as soon as something struck you on the shoulder. A. As soon as it buried me.  .  .  .   Q. Now you are not able to say now that that man might not have dropped something on your shoulder that broke the bone, and caused you to become unconscious, are you?  A. I know he didn't. Q. How do you know, if you lost consciousness and don't know what hit you, how do you know he didn't drop something on you if you lost consciousness?  A. Well, one reason is that I kept the stuff pretty well throwed up to him on the upper floor.   Q. How do you know he didn't pick up a piece of this concrete, and try to throw that out, and it dropped on you?  A. Because there was no concrete loosened up.   Q. How do you know there wasn't any loosened up at that time?  You never went back afterwards, did you, to look at the top of that pillar?  A. No; and then I spoke to Mr. Lane just before the thing fell asking for the privilege of taking that there granitoid off and throwing it out of there, and working from the top.   Q. You don't know what that man on top of the pillar might have had in his hands, and suddenly let fall on you, do you?  A. No, sir.

II.   It will be noted that plaintiff relied wholly on circumstantial evidence to show how the accident occurred. Appellant insists that he did not succeed.   The testimony was that there was a caving in of sand, dirt or some kind of soft material from the direction of the pilaster beside which he was working; that it seemed to come from the pilaster; that it filled in about him above the waist; that it first struck him on the shoulder; and that he felt himself being

buried by some soft material when he lost consciousness. He admitted on cross-examination that he was not positive that this occurred, but said that it seemed so to him. Apparently all happened in so short a time that he had no opportunity to observe before he was rendered unconscious by the falling sand or something striking his shoulder. From this evidence the only reasonable inference was that the sand or dirt had slid or fallen away from the pilaster about him. The jury might have concluded it came from that direction, and it could not well have come from the side of the pit beyond the pilaster. This was about three or four feet square and eight feet high, with the granitoid on top, and must have dried out some in the several days it had been in this condition, and the inference that the sand or dirt which slid about plaintiff came therefrom is exceedingly probable, and, in the absence of any other explanation, might well have been adopted by the jury. If the falling dirt or sand carried the granitoid with it, or a tool used from the laborer above and one of these struck plaintiff, such falling was quite as much the proximate result as though a stone or other substance in the dirt or sand had been carried against his shoulder, and caused the fracture. Of course, the injury may have been occasioned by the laborer above dropping a tool or a piece of granitoid, as suggested by appellant, or in other conceivable ways, but there is nothing in the evidence pointing to any such cause, and, as the falling of the sand and dirt from the pilaster reasonably might have produced the injury and no other explanation is afforded by the record, the jury might have concluded that this was the operating agency in bringing about the result.

As contended, if the injury might have been caused in several different ways and the probabilities as to two or more are balanced, then there can be no recovery. *Neal v. Railway,* 129 Iowa, 5. This is only another way of expressing the rule laid down in *Asbach v. Railway,* 74 Iowa,

248, in saying that the theory on which recovery must be had can not be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature, and are so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them. It is not sufficient that they may be consistent merely with that theory, for that may be true, and yet they may have no tendency to prove the theory. This is tantamount to saying the evidence must be such as in the nature of the case will convince an ordinarily reasonable person that the injury complained of was the proximate result of the particular cause alleged. If another inconsistent with the cause alleged is equally probable, the former can not be said to have been proven. But, as said in *Brownfield v. Railway,* 107 Iowa, 254: "Where a cause is shown which might produce an accident in a certain way, and an accident happens in that manner, it is a warrantable presumption, in the absence of showing of other cause, that the one known was the operative agency in bringing about the result." *Degelau v. Wight,* 114 Iowa, 52; *Tibbits v. Railway,* 138 Iowa, 179; *Brown v. Coal Co.,* 143 Iowa, 663; *Bell v. Bettendorf Axle Co.,* 146 Iowa, 337; *Paulson v. Bettendorf Axle Co.,* 146 Iowa, 399.

*1. MASTER AND SERVANT: negligence: proximate cause: evidence.*

The evidence was sufficient under this rule to carry to the jury the issue as to whether the injury was caused by the sand and dirt falling or sliding from the pilaster.

III. Counsel for appellant argue that there was no evidence tending to sustain findings that the pit was an unsafe place to work, or that the defendant was negligent in not warning the plaintiff of the dangers incident to the work. The evidence tended to show that the pit was so dimly lighted that plaintiff, when he entered, could not see the nature of the soil, but was able to see the ridge next to the pilaster, but apparently forming no part of it. He was directed to re-

*2. SAME: safe place to work: evidence.*

move the ridge, and there is nothing in the record indicating that he attempted anything else. The falling or sliding of the earth composing the pilaster was not a thing to be anticipated, as where laborers are shoveling banks of clay or gravel, and it falls or slides down as the work proceeds. See *Fredericks v. Brick & Tile Co.,* 151 Iowa, 637; *Naylor v. Railway,* 53 Wis. 661 (11 N. W. 24); *Swanson v. Railway,* 68 Minn. 184 (70 N. W. 978). This pillar did not constitute a transitory danger incident to the work, at least nothing in the record indicates but that it was intended to remain permanently.

Plaintiff knew nothing of danger to be anticipated therefrom, but proceeded to do the very thing required, which, as it did not apparently undermine said pilaster,

3. SAME: assumption of risk. he had the right to assume might be done in safety. *Herr v. Green,* 156 Iowa, 532. True, had excavated tile and sewer drains, but in what manner that would have aided him in ascertaining in this dimly lighted pit that this pilaster was not likely to stand we are not informed. Conditions were such that the court did not err in leaving the jury to say whether defendant was negligent in failing to furnish a safe place to work and in omitting to put a guard against its dangerous condition if so found.

IV. Another contention is that the instructions are confusing as to the issues with respect to the negligence alleged. The pleadings were copied therein, and therefrom

4. SAME: submission of issues: prejudice. it appears that there were five grounds of negligence: (1) the pilaster was dangerous, in that no support therefor was provided; (2) in failing to make use of another device for the purpose for which the pilaster was left; (3) in failing to warn of the dangers in doing what was required of him; (4) in failing to light the pit; and (5) in not providing a safe place in which to work. In the third instruction the jury was told that, in order to recover, it must appear that "the

falling upon him of the pillar in question was the result of some negligence upon the part of defendant," and in the fifth instruction that, to warrant a recovery, it must be found (1) "that before or at the time of his injuries the defendant was negligent substantially as claimed, as above set out and that its negligence was the cause of his injuries; (2) that he was himself free from any negligence which contributed to his injuries; (3) the amount which he was damaged by reason of such injuries. And you should, in your deliberations, take up each one of these propositions in the order stated, and discuss and decide them one at a time." In the sixth instruction the alleged negligence of defendant is taken up, and, after some discussion, the jury are told the questions of defendant's negligence for their consideration are narrowed down to these:

(1st) Was the place in which the plaintiff was working at the time he received the injuries complained of an unsafe place to work?

(2) If you find that it was a safe place to work, then you need go no further, and your verdict should be for the defendant. If, on the other hand, you find it to be an unsafe place to work, then you should determine whether or not the defendant, in the exercise of reasonable care, should have known that it was an unsafe place to work.

(3d) Should defendant have warned plaintiff of such dangers?

This statement of the record excludes all doubt as to the grounds of negligence actually submitted. The jury are plainly told in the sixth instruction that these were narrowed down to two, and then this is emphasized by instructing that, in event the pit was a safe place to work, to find for defendant, and, if not, to determine whether plaintiff should have been given warning. There was no prejudice in copying the pleadings as subsequently grounds of negligence stated therein not sustained by the evidence were eliminated and the issues to be determined clearly expressed.

· V.   In the seventh instruction the court told the jury that the negligence of the officers or agents of a corporation is that of the corporation, and, as Lane was an officer of defendant, any negligence on his part was imputable to it.   The instruction is not accurate in describing Lane as an officer, for he was not, nor in saying broadly that "any" negligence on his part was that of defendant, for whether he was vice principal was not conclusively established.   But all this was without prejudice, for Lane in what he did in the matter of providing a safe place in which to work or in the matter of giving necessary warning of conditions rendering the place unsafe was performing a masterial duty, and any negligence of the foreman therein was that of defendant.   *McGuire v. Waterloo & C. F. Union Mill Co.,* 137 Iowa, 447; *Hamm v. Bettendorf Axle Co.,* 147 Iowa, 681; *Hardy v. Railway,* 149 Iowa, 41.   The amount allowed as damages was not so large as to justify interference therewith.—*Affirmed.*

5. SAME:
instructions:
negligence
of agent.