A. A. PALMER v. CEDAR RAPIDS & MARION CITY RAILWAY Co., Appellant.

**Street railways:** PERSONAL INJURY: NEGLIGENCE: EVIDENCE. In an
1 action for injuries resulting from a collision with a street car, the evidence is considered, and it is held that the negligence of defendant and contributory negligence of plaintiff were for the jury to determine.

**Negligence of third party.** The negligence of a third person, though
2 contributory to an injury, will not relieve a defendant from the consequences of his negligence.

**Damages:** VERDICT. It is the province of the jury to determine the
3 quantum of damages, and unless so excessive, or inadequate as to indicate passion, prejudice, or corruption, will not be disturbed. Under the evidence a verdict of $500.00 for the loss of the use of a hand is sustained.

*Appeal from Linn District Court.*—HON. H. M. REMLEY, Judge.

TUESDAY, JULY 12, 1904.

ACTION for damages occasioned by a collision with a street car. Verdict and judgment for plaintiff. Both parties appeal; that of defendant being first perfected.— *Affirmed.*

*Chas. A. Clark & Son* and *Wm. G. Clark,* for appellant.

*Rickel, Crocker & Tourtellot,* for appellee.

LADD, J.— Third street, in Cedar Rapids, along which

defendant operates a street railway, intersects F avenue. On
the 15th of June, 1898, at about five o'clock p.
m., the plaintiff, while riding a lady's bicycle,
collided with one of its cars. With a loaf of
bread tied to the handle bars and beefsteak in his pocket, he
was riding on the north side of the road. He testified that he
listened for, without hearing, the gong and rumble of the car,
until he saw a team and wagon coming rapidly around the cor-
ner toward him. He first saw it when about twenty feet from
the corner. He was then ten or twelve feet from the curbing
on F avenue, and about fifteen feet from the east line of Third
street, or, as he testified at another time, about twenty-five
or thirty feet from the approach to the sidewalk on the east
side of Third street. The street was forty feet wide between
the curbs, leaving a space ten feet wide on each side for the
sidewalk. The evidence tended to show the houses along the
streets and the trees and shrubbery obscured the view so that
he could not have seen up and down Third street before
reaching the curbing. The plaintiff testified: " I could not
pass the team on the right on account of his turning the corner
so closely. The only thing I saw was to take a swift turn
to the left, and get out of the way, in order to clear myself.
It naturally mixed me up for the time being. I turned
quickly to the left to get out of the way, and the next thing
that confronted me was a street car in front of me about four
or five feet, and five or six feet to my left. It was impossible
for me to pass ahead of this car, and I deflected my wheel
to the left instantly, and threw up my hand and went into it.
I had no opportunity to jump off or dismount. I struck the
car, and went down between the wheel and the car. My hand
naturally followed the car down and the rear wheel ran over
it. It was my right hand, and the hand was broken, crushed,
or torn to pieces, and I am unable now to close my fingers,
or to even use a knife or fork, or to use it in any manner
whatever. * * * I had been riding a bicycle four or
five years, and could handle it with ordinary skill in ordinary

*(margin note)* i. PERSONAL INJURY: negligence; evidence.

occasions. I cannot tell how far it took me to make the turn. Q. Did you look at all for the car, or look for the car after you started to turn until you struck it? A. Well, the only way I can answer that is to explain it this way: that I didn't have time, after I got straightened up, and after I got away from this team, until I was up near the tracks, and there was the car. Q. Well, did you look? A. Look? I looked, and it was there. I could not tell exactly how fast that team was going. It was going faster than I was."

The witnesses do not agree whether the car was going north or south. It was moving at a high rate of speed, and whether the gong was sounded at the center of the block, as was usual, was in dispute. That the jury might have found the defendant negligent does not seem to be questioned, and we think the issue as to whether plaintiff contributed to his injury by his own fault properly left to the jury. The appellant's observations concerning his situation with reference to the team overlooks the fact that until he had turned so as to avoid it the car had not been seen. All that could be claimed for the team is that it so diverted his attention in approaching the track that he did not notice the car in time to avoid the collision. He may have been slow in turning from the team, whose driver appears to have ignored his privilege of riding on the right side of the street. At that time, if he is to be believed — and he is somewhat corroborated — he had no reason to apprehend the approach of a car, and if the coming of the team so absorbed his attention that, acting as a prudent man would under like circumstances, he did not notice the car in time to avoid it, he cannot be said to have been negligent.

The criticism of the seventh and eighth instructions as unduly emphasizing the claim that plaintiff's attention was diverted by the team is without merit.

The negligence, if any, of the driver of the team in taking the extreme left side of F avenue is that referred to in the eighth instruction. The evidence tended to show

that he did so, and there was no error in telling the jury that, even though this contributed to the injury, it would not relieve defendant from the consequences, if any, of its own negligence.

2. NEGLIGENCE OF THIRD PARTY.

II.   The verdict was for $500.   The plaintiff insists that this was inadequate.   On the former trial it was $100. It is said the action of the jury in the first trial was influenced by the erroneous admission of the record of his conviction in the federal court for selling intoxicants without a license.   113 Iowa, 442.   On the last trial it may have been by his admission that he had been interested in the keeping of a liquor nuisance at about the same time.   He was forty years old, and had an expectancy, according to the life tables, of 27 years.   The record is such, however, as to leave it extremely doubtful whether the injury received will materially diminish the amount of work the plaintiff would have been likely to perform during that period.   For a little more than a year he claims to have been what may be termed a " curbstone hay broker," without any regular place of business.   He estimates that he earned from $15 to $20 per week in buying hay and feed on the streets of Cedar Rapids, and, without transferring it, again selling and delivering to some customer.   He testified:   " As a matter of fact, this business of buying or selling hay or feed varies greatly from day to day — the amount of business I could do.   I had no place for storing hay or feed or anything of that kind.   If I held it over from one day until another, it usually stood on the wagon until I was ready to haul it out and deliver it.   *   *   *   Of course, I could not buy much. We could not handle any great amount in one day.   The hay was mostly loose.   *   *   *   Rainy days, of course, I did not do much."   As to his previous engagements he testified to operating a billiard hall and being interested in the sale of whisky in the basement below it at a time when such sale must have been illegal, but was unable to recall the duration of that business.   He further testified:   " I do not recollect

3. DAMAGES: verdict.

how long before this accident I went out of the billiard hall business. I couldn't undertake to say. It might be five or seven years. Q. What were you doing between the time you quit that and the time you commenced buying hay and grain? A. There was a period there of a year or so that I did not do anything — possibly a year or two. I don't know as I done anything right after I went out of the billiard hall business. Q. What was the first thing you did do after that? A. Well, I didn't have any regular vocation. I might have done different things. I didn't have any regular calling. Q. What were the different things? A. I couldn't tell. Q. Couldn't you tell anything? A. I don't know as I could, particularly." He had previously intimated having worked " off and on " for one firm " part of two years," might have been there three times, but was not sure. He also helped his father some, and clerked in a saloon a week.

It is manifest from this evidence that the plaintiff has been for many years what counsel have characterized him, a " loafer." While he may have bought and sold some hay, his account of the income derived therefrom was open to suspicion, and, in view of the story of his past life, might have been rejected by the jury. Indeed, that body might well have found that the injury had no effect on the plaintiff's inclination or capacity to earn money. The physician's charge for medical attendance was $100, leaving $400 which the jury might have allowed for pain and the deformity of his hand. Dr. Ladd, who dressed the hand, testified that it " was lacerated from the base of the little finger; cut right through, clear back. Then it was torn across the palm of the hand, around the base of the thumb, and the thumb was lying back, dislocated. Some bones were crushed — the metacarpal bones. * * * The second finger was crushed. Bones and ligaments were torn, and there was a hole right through the hand. * * * The fingers are stiff, and the motion of the wrist is impaired. As a hand it is very nearly destroyed by reason of this injury." The wound was very

painful while healing. Besides this, the muscles of his right arm were torn, the scalp wounded, and the shoulder bruised. There is no established criterion for measuring such damages. Fixing the quantum is discretionary with the jury, and it is universally held that such discretion should not be interfered with unless the amount allowed is so excessive or inadequate as to indicate passion, prejudice, partiality, or corruption. See 8 Am. Eng. Ency. of Law (2d Ed.) 629. That the court may entertain the notion that the amount is too small is not enough. If it is compensatory and substantial, as in the instant case, and the trial court has declined to grant a new trial, this court ought not to interfere. In the cases relied on by appellee, with one exception, the actual loss in earnings or prospective earnings and expenses exceeded the amount of the verdicts adjudged inadequate. See *McNeill v. Lyons,* 20 R. I. 672 (40 Atl. Rep. 831); *May v. Hahn,* 22 Tex. Civ. App. 365 (54 S. W. Rep. 416); *Michalke v. Galveston, H. & S. A. R. R. Co.,* — Tex. Civ. App. — (27 S. W. Rep. 165). In *Caldwell v. Vicksburg, S. & V. R. R. Co.,* 41 La. Ann. 625 (6 South. Rep. 217), the verdict was increased in pursuance of a requirement of law that the court should pass upon the facts as well as the law of the case. The exception is *Henderson v. Railroad,* 52 Minn. 479 (55 N. W. Rep. 53), where a boy eleven years old was injured; but something is to be presumed in favor of the earning capacity in the future of an immature person permanently disabled.

In view of the persistency of the jury in returning small verdicts, and the approval of the last one by the district court, this court ought not to interfere.— AFFIRMED.