C. P. OHLSON, Administrator, Appellant, v. SAC COUNTY FARM-ERS' MUTUAL FIRE INSURANCE ASSOCIATION, Appellee.

**EVIDENCE:**   Presumptions—Force and Effect of Presumption.   It is
1   not error, in a civil case, for the court to refuse to instruct that, on an issue involving the commission of crime, "a natural presumption of innocence exists," and that such presumption "has the force of affirmative evidence."

**EVIDENCE:**   Weight and Sufficiency—Circumstantial Evidence.   An
2   allegation of fact may not be said to be proven by circumstantial evidence, unless the circumstances relied on are of such a nature and are so related that such fact is the only conclusion that can be fairly drawn from such circumstances.   Applied on the issue whether an insured had willfully burned the insured property.

*Appeal from Sac District Court.*—M. E. HUTCHISON, Judge.

MAY 6, 1921.

ACTION at law to recover the insurance upon certain buildings destroyed by fire. That the property was, in fact, insured by a policy issued by the defendant association is admitted, and the single defense offered by said association is the affirmative allegation that the fire which consumed the insured property was designedly set by the plaintiff's intestate. There was a verdict for defendant, and plaintiff appeals.—*Reversed.*

W. A. *Helsell*, for appellant.

*Malcolm Currie, Faville & Whitney*, and *Robert Healy*, for appellee.

WEAVER, J.—Few more tragic stories find their way into the Law Reports than is embodied in the brief record of this cause. Jacob Neubauer was a farmer in Sac County. His name suggests a man of foreign birth or lineage. He had acquired a farm of 120 acres of land, well improved, on which were a dwelling house, barn, machine shed, poultry house, hog house, tool house, corncrib, and other conveniences. The buildings were in good condition, and the house well furnished. He had an automobile, for which he had paid $1,700, and farm machinery in considerable profusion. Before the fire, he had been offered $30,000 for the farm, but was holding out for a price of $32,000. He was a married man, with a family of wife and one child. It is said, and is probably true, that he was addicted to drink; and it appears that, from this or some other cause, the relations between himself and wife were not harmonious, and that, sometime during the summer of 1915, the wife instituted proceedings for divorce. The parties were represented by counsel, through whom an agreement was made for adjustment of property rights, in the event that a divorce was granted. The stipulation bears date of September 8, 1915, and by its terms the husband agreed to pay his wife the sum of $13,500 alimony, in full of all her claims upon him. To facilitate and secure the payment of this money, the parties united in executing a deed of the farm to blank grantee, and deposited it with counsel. The decree of divorce was granted, the property settlement affirmed, and the custody of the only child given to the wife.

On the same day, the deceased met one Burnquist, the man who was proposing to purchase the farm, and told him he had settled with his wife, but that he had been offered $32,000 by another buyer, and asked Burnquist if he would pay that amount. Burnquist refused, but told him, in substance, to come to him when he got the best obtainable offer from others. In the early morning of September 10th, a fire destroyed the house and out-buildings on the Neubauer farm, together with practically all their contents. Sometime in the night of September 11th, Neubauer drowned himself in the cistern on the site of his ruined home. The plaintiff herein was appointed administrator of the estate of the deceased, and brought this action to recover the insurance upon the burned property. This action, as we have already said, was defended on the sole ground that Neubauer designedly set the fire which consumed his property. On trial to a jury, this defense was sustained, and verdict was returned for defendant. A new trial was denied, and plaintiff appeals.

The argument for reversal is largely devoted to two propositions: First, that the court erred in refusing a requested instruction on the effect to be given to a presumption of the innocence of the deceased of the wrongful act attributed to him by the defense; and second, that the verdict is without sufficient support in the evidence. It is to these assignments of error that we shall confine our discussion.

I.   The instruction asked by the plaintiff is to the effect that, if Neubauer designedly burned the property, such act would constitute a crime; and that, where a charge of that kind is made,

1. EVIDENCE: presumptions: force and effect of presumption. "a natural presumption of innocence exists," and the jury may properly consider the improbability that one "will commit an act of a criminal nature." The court was also requested to further charge that "a presumption has the force of affirmative evidence, and, unless negatived by testimony or surrounding facts and circumstances of the case, it should prevail. The weight, however, to be given a presumption when considered with other evidence in the case is a matter for the decision of the jury."

Counsel on either side have gone deeply into discussion of the law with respect to the force and effect of presumptions in the trial of an issue of fact. We deem it unnecessary, in this

case, to attempt any final answer to this more or less vexed question, upon which some modern law writers and courts have expended (or wasted) a vast amount of learning, without shedding upon it any appreciable degree of light. We are not disposed, at this time, to go the length insisted upon by counsel for appellee, and hold that a presumption is *never* "evidence of anything." We have often held otherwise. But it does not follow that our rejection of such broad contention requires or justifies us in holding that the trial court erred in refusing the requested instruction in this case. It is not always advisable or permissible for the trial court to instruct a jury upon abstract legal principles. To do so tends often to obscure the question of fact on which the jury is to pass, and thus serves to mislead, rather than aid, the triers of fact in reaching a just conclusion. There are presumptions and presumptions. It has been said that "presumptions, like probabilities, are of different degrees of strength." *Decker v. Somerset M. F. Ins. Co.*, 66 Me. 406. That the rule denying the force of evidence to presumption is not necessarily of universal application is implied in the holding quoted by appellee from our case of *State v. Linhoff*, 121 Iowa 632 (a criminal case), that the refusal of an instruction somewhat like the one asked in the present instance was not error. The meat of the ruling there found is in the language "it is enough to say we do not approve of the doctrine that legal presumptions *such as the one in question* are to be treated as evidence," thus carefully limiting the effect of the decision to the class or kind of cases of which the one then being considered was an example.

The case of *Agnew v. United States*, 165 U. S. 36, often cited as having overruled the decision in *Coffin v. United States*, 156 U. S. 432, is not authority for that proposition. The most which can be said of the *Agnew* case, so far as it relates to this particular question, is that it holds that, the trial court having already fully instructed the jury that "the defendant is presumed to be innocent of all the charges against him until he is found guilty by the evidence submitted to you, [and] this presumption remains with the defendant until such time in the progress of the case that you are satisfied of the guilt beyond a reasonable doubt," there was no error in refusing a request

for an additional instruction such as was given in the *Coffin* case, which is, in substance, the instruction requested by the defense herein. In the same connection, it was there said that the instruction asked might well have been refused "on the ground of the tendency of its *closing sentence* to mislead." The closing sentence referred to reads:

"This presumption is to be treated by you as evidence giving rise to resulting proof to the full extent of its legal efficacy."

There can be no doubt that this sentence emphasized or over-emphasized the effect of the presumption as evidence, in a manner calculated to mislead; but, if the "closing sentence" so criticised be stricken entirely from the instruction in the *Coffin* case, there is still left in it the definite declaration that the presumption "is evidence in favor of the accused." We refer to these precedents because they are urged upon our attention by counsel for appellee as authority for their contention that in *no case* can a legal presumption have force or value as evidence.

Upon the record as it appears in this case, we are disposed to hold that there was no error in refusing the instruction offered by the defense, and to leave the further question of the evidentiary value of presumption generally for consideration when its disposition 'is more directly demanded. That as yet we have not committed ourselves to a general denial of the probative value of presumptions under all circumstances, see *Bixby v. Carskadden*, 55 Iowa 533; *Stephenson v. Bankers Life Assn.*, 108 Iowa 637, 641; *Stewart v. Iowa Cent. R. Co.*, 136 Iowa 182; *Korab v. Chicago, R. I. & P. R. Co.*, 149 Iowa 718; *Dalton v. Chicago, R. I. & P. R. Co.*, 104 Iowa 26; *Connell v. Iowa S. T. M. Assn.*, 139 Iowa 444. It is enough for the present that we hold that the court did not err in refusing the plaintiff's request.

II. We turn now to the inquiry of paramount importance in this case. Is the verdict justified by the evidence produced on the trial? We have carefully read and reread the entire testimony (which is brief), and are compelled to say that the finding of the jury is without any substantial support. Speaking first of the direct evidence, no witness testifies to seeing Neubauer set the fire, or to any act on his part necessarily inconsis-

2. EVIDENCE: weight and sufficiency: circumstantial evidence.

tent with his entire innocence. The evidence relied upon by the appellee is wholly circumstantial, and in our judgment falls far short of the requirement of the established rule that, even in a civil action, an allegation of crime cannot be said to have been proved by circumstantial evidence unless the facts relied upon are of such nature and are so related to each other that it is the only conclusion that can fairly or reasonably be drawn from them. It is not sufficient that they be merely consistent with the allegation. *Asbach v. Chicago, B. & Q. R. Co.,* 74 Iowa 248; *Kennedy v. Chicago & N. W. R. Co.,* 90 Iowa 754; *Neal v. Chicago, R. I. & P. R. Co.,* 129 Iowa 5; *Klumb v. Iowa S. T. M. Assn.,* 141 Iowa 519, 523; *Johnson v. Corn Prod. Ref. Co.,* 157 Iowa 420.

A brief description of the location of the burned buildings will be of assistance in applying the testimony. The house faced north, upon an east and west highway. Immediately south of the house, a few feet removed, was a smaller building, used as a summer kitchen. The barn, machine shed, and poultry house were to the southeast. The corncrib was northeast of the barn, and the tool house and hog house were directly north of the barn and east of the house, together making up a cluster of buildings such as are quite common on Iowa farms. As will be seen, the general direction of the outbuildings from the dwelling was southeast and east. On the morning in question, the wind was blowing from the southeast. It appears without dispute that the barn was the first building destroyed. Nearest the barn in the line of the wind was the machine shed. Next in order in that direction was the summer kitchen, and immediately beyond that was the dwelling. The summer kitchen, being a small structure, was obscured by the house in front of it from the view of observers on the highway in front, until the observer moved some distance eastward. The house of the witness Lasher, hereinafter named, was some 30 rods west, on the north side of the road. The other three witnesses for the defense, George Miller and his two sons, William and Frank, lived a mile to the north and west. On the morning in question, the Miller boys had risen early, before it was yet fairly light, preparatory to a contemplated trip from home. They saw the appearance of a fire to the southeast, and one of them, going to the top of the house, announced a fire at Neubauer's. They called up their father, who, in turn,

gave the alarm by telephone to their neighbors, and, hitching up their team, drove to the scene of the fire.   Approaching from the west, they stopped and hitched their team at Lasher's. The elder Miller and William went on to Neubauer's, while Lasher, who says he dressed quickly and "slid down stairs," joined Frank, and they followed the others on the run.   These four persons, together with four others, hereinafter named, who testified for the plaintiff, appear to be the only witnesses of the fire.   The last-mentioned four did not arrive quite so early as the others, but the difference in time could not have been to exceed a few minutes.   As to time, George Miller says that, when he was called by his sons and was telephoning to his neighbors, he noticed the time to be 20 minutes to 4, but that he does not know the exact time when they reached Neubauer's.   The other parties say they arrived at the fire at about half past 4. When the latter arrived, Neubauer and the Miller party were all standing in the road in front of the house.

The witnesses differ quite materially as to the extent of the fire at the time of their arrival.   George Miller says, with some degree of positiveness, that, when he came, the barn was the only building burning, and was "practically down" at the time.   William Miller says:

"I think the barn was the only building burning.   There was not much of the barn left.   I do not think the house was on fire."

Later in his testimony, he says it was not on fire.

On the other hand, Frank says:

"The barn was on fire when I reached there.   It was practically burned.   The machine shed and hog house and shop were burning, and the dwelling house was just beginning to burn. It was on fire on the east side of the kitchen."

Lasher testifies that, when he got to the place:

"George and William Miller were in the road north of the house; the barn was burned; the machine shed was on fire; and smoke and fire were coming out of the east windows of the house. * * * When we went as far east as the big gate, I observed smoke and flames coming out of the east side of the house. *I do not know about the summer kitchen, because I could not see that from the east gate.*"

On the testimony of these four witnesses the defense relies, so far as relates to their observation of the fire itself. Of what they have to say regarding the acts and words of Neubauer on that occasion, we will speak a little farther along.

The other witnesses who were on the ground that morning testify as follows: Theodore Neubauer, stepson of the deceased, says he was there at 4.45 A. M., and that, when he arrived, "the barn was burned, as was also the machine shed. *The summer kitchen was burned clear to the ground.* The house itself was pretty well burned, but was still standing and burning."

Almer Alderson, there at half past 4, says:

"When we reached the place, *the summer kitchen that stood on the south side of the house was completely burned down. The house itself was not burned, but the kitchen part was pretty well under way. The barn and machine shed were completely burned down.*"

Joseph Alderson says that, when he arrived, at about half past 4, the Miller party and Neubauer were standing in the road in front of the house. He went around into the yard, and of his observation he says:

"*The summer kitchen, when I got there, was practically gone. The barn was all gone, and the machine shed was all gone. The kitchen part of the house was pretty well gone. The fire was climbing up the back part there.* The kitchen was standing, but pretty well eaten into."

William Halboth, who arrived with the Aldersons, says that, when he got there, the Miller party and Neubauer were standing in front of the house. The witness "walked on into the property. *The summer kitchen was burned to the ground; the kitchen to the house I would call about half gone; and the barn and machine shed were all burned.*"

The foregoing is all the material direct evidence of the discovery, course, and progress of the fire. There is, as we have said, *no* direct evidence of its origin.

The one circumstance chiefly relied upon to fasten the act upon Neubauer is that the two witnesses first arriving on the scene say they saw him go into the north door of the dwelling, before the house was on fire, and that, almost immediately thereafter, the flames broke out through the east windows. Aside

from this one item of evidence, the circumstances put forward as tending to show the guilt of the deceased are so trifling or so clearly without inculpatory significance that their array in argument in support of the verdict can be accounted for on no theory except the poverty of material of more convincing character. These circumstances, seriously and gravely argued as demonstrating the guilt of deceased, are that he had the opportunity to commit the act; that he did not manifest excitement or nervousness in the presence of the witnesses; that he did not cough or choke like one coming from a building or room filled with smoke; that he was chewing tobacco; that he was followed by two dogs; that he had his hands in his pockets; that he sat down with his back to the burning building; that, in response to a question by Lasher about trying to save some of the furniture, he said the house was full of fire and smoke, and he didn't want anybody to get hurt; that his horses were not in the barn, but out in the pasture; that, seeing Lasher gazing at the fire, he asked, ''Don't you like to look at that?'' and when Lasher said ''No,'' he responded, ''Look the other way; that is the way I do.''

Recurring now to the first and principal fact here mentioned, the alleged entrance of the house by deceased immediately before the witnesses saw the flames break through the windows. Surely, there can be no sinister significance in the mere fact that deceased saw fit to enter his own house, which, if not then burning, stood in direct line of the fire which was consuming his other buildings; and if it be true, as these witnesses say, that the flames burst from the east window of the kitchen within two minutes after he entered the north door of the front room, does that fact warrant the inference that he set the fire? On the contrary, does not the fact that the flames had reached such development as to break through the window (or ''east wall,'' as some of them say), almost simultaneously with his entrance into the building, demonstrate to a reasonable certainty that he did *not* set the fire? Again, the evidence as a whole reasonably shows that, when the witnesses, standing in front of the house, say that the building was not on fire, they were mistaken, and that it was doubtless on fire at the rear, out of their sight. It is shown, without dispute, that, immediately south of the dwell-

ing, out of sight from those immediately in front, stood a small building, a summer kitchen. It was in direct line with the wind from the burning barn and machine shed, where it is quite humanly improbable that it would escape destruction. The witnesses Almer Alderson, Joseph Alderson, William Halboth, and Theodore Neubauer, who arrived on the ground about half past 4, and did not content themselves with the view from the road, but walked on into the property, all say that the summer kitchen was burned down. Theodore says:

"The summer kitchen was burned clear to the ground. The house itself was still standing and burning."

Almer Alderson says that the summer kitchen "was completely burned down. The house itself was not burned, but the kitchen was pretty well under way when we got there. The main part was not. The barn and machine shed were completely burned down." Joseph Alderson says:

"The summer kitchen was practically all gone; the kitchen part of the house was pretty well gone. The fire was climbing up the back part there."

And Halboth says:

"The summer kitchen was burned to the ground. The kitchen to the house I would call about half gone, and the barn and machine shed were all burned."

Of the Miller party, Lasher says:

"I do not know about the summer kitchen, because I could not see it from the front gate."

George Miller, who claims to have noticed that it was not on fire, says:

"I could not see this summer kitchen until I got east of the house, walking on the road."

It would be very easy for those standing in the road to be mistaken in the thought that the house was not on fire, while it was, in fact, making its way into the south side, through the openings shown to exist between the house and the summer kitchen, but 5 feet distant. The light of a fire there would, in its beginnings at least, be drowned in the greater light from the burning barn and machine shed just beyond, and not be noticed by those in the road on the north until it had assumed considerable proportions.

Again, it will be remembered that the fire began in the barn, and had been in progress long enough to attract attention of the Millers, a mile away, and long enough for them to prepare their team, phone to their neighbors, and drive to the scene, where they found the barn all burned "except the big timbers," and, according to all the witnesses except George Miller, the machine shed also practically destroyed; and yet, according to the theory of the defense, this cunning, scheming man, bent on secretly destroying his own property for some inscrutable purpose, having started the fire at his barn, thus lighting a signal sure to bring in a crowd of witnesses, waited until they had arrived, and before their eyes went into his dwelling and there applied the torch, to complete his harvest of wreck and ruin. Can any reasonably right-thinking man say that this solution of the controversy in this case fairly excludes every hypothesis of the innocence of the deceased of the charge thus made against him?

If there be any rule of evidence requiring his administrator to advance a theory to explain the act of the deceased in entering his own house under the circumstances, it is to be said that the witnesses arriving at the fire found the man but partly dressed, being in his shirt sleeves, and wearing a pair of house slippers. To indicate the completeness of his loss, he said to a witness (referring to his clothes), "These are all" or "this is all I have left." Afterward, he said to Burnquist, the man who bought the property, that he didn't even save his vest and gold watch. Burnquist further says that, soon afterward, in clearing out the cellar of the dwelling, he discovered in the debris left by the fire the ruins of the watch. Is it not a reasonable supposition or hypothesis that he went into the house to rescue his watch and vest or other clothing? Who can say that none of all the easily possible legitimate reasons which might lead or induce him to make a last entrance into the house, the destruction of which was then inevitable, may be accepted, and that, upon the merest guess, the most uncharitable conjecture the jury may properly find, he entered there bent upon the perpetration of a felony?

So far as appears, this man had not the slightest motive of profit to himself or vengeance or spite upon others to lead him to such an act. It is admitted of record that the property was

·not overinsured, and that, if he did not designedly burn it, his administrator is entitled to a verdict for the full amount. He was offered $30,000 for the farm immediately before the fire, and was demanding $32,000. On the day after the fire, he sold it for $26,000. The insurance was but $2,700. Thus it will be seen that he had nothing to gain by a voluntary destruction of the property. On the contrary, even if the insurance had been paid, the amount so realized would be very much less than he would have received, had the fire not occurred. It is said for the appellee that deceased must have been acting to spite the wife from whom he had just been divorced, but for this theory the record reveals no foundation. The divorce was already granted. The property interests of the parties had been settled and adjusted. The wife no longer had any claim upon him or upon ·his property. How it was possible for him to conceive the idea that, by turning incendiary, and firing his home, he was punishing a person who neither had nor asserted a claim of any kind against him or the property, is not suggested by counsel, and is altogether too fanciful and far-fetched to command credence. That deceased was laboring under no such delusion affirmatively appears from the evidence of witnesses present at the fire, who quote him as saying at the time that he had settled with his wife "fair and square," and that the loss was all his own. For the purposes of this appeal, it must be taken for granted that deceased was a sane man; and a sane man does not ordinarily do a deliberately wrongful act without some motive; and absence of any proof of motive, in a chain of circumstantial evidence in support of such charge as is here made, is a fact not to be disregarded.

There are still other fact considerations not without weight, tending to add strength to the conclusion we have reached; but we think it is unnecessary to pursue the recitation further, except to say that the conduct of the deceased on the day following the fire shows nothing to sustain the charge that his loss by the fire was one of his own making. As we have before said, there had been a negotiation for the sale of the farm to Burnquist, and the matter was still pending for adjustment of the price, Burnquist offering $30,000 and Neubauer asking $32,000. After the fire they met, and Neubauer said: "I suppose you

do not want the place now that everything is burned?''  Burnquist responded: ''No, I do not want it at the figure I was to pay.''  ''Well, then,'' said Neubauer, ''will you buy it now, if we can agree?''  Thereupon, they renewed negotiation, and the sale was effected at $26,000, or $4,000 less than would have been realized, but for the fire.  On the night following, Neubauer committed suicide.  It is difficult to account for the result of the trial below, except upon the theory that his suicide was by the jury held to imply some sort of confession of the wrong charged against him in this case.  Of course, counsel do not advance any such theory, and it can be given no weight in support of the verdict.

It may be true that Jacob Neubauer's misfortunes were, to a great extent, the fruit of his own mistakes and his own faults. If, in his domestic relations, he failed in his duty to his wife and child, he paid a grievous penalty.  His sins, if any, in this respect are such as have ruined the happiness of thousands of other men who are not offenders against the criminal law, men whose characters as law-abiding citizens are unimpeachable; and we have no right to hold him guilty of an offense of which there is no tangible evidence.  His general character is in no manner assailed or questioned, and the fact that this wifeless husband, childless father, and homeless man threw up his hands in defeat before the onslaught of misfortune, self-created though it be, and sought ''surcease of sorrow'' in a suicide's death, amid the ashes of the home to the building of which he had given his life labor, may be a confession of inglorious failure: it is not license to brand his memory with the stain of felonious wrongdoing.

This conclusion renders further consideration of matters discussed in argument unnecessary.  For the reasons stated in the last paragraph of this opinion, the judgment below is reversed, and cause remanded for new trial.—*Reversed.*

EVANS, C. J., PRESTON, STEVENS, and DE GRAFF, JJ., concur.

FAVILLE, J., takes no part.