Naomi Christensen, by Minnie Christensen, her mother and next friend, Appellee, v. Bernie Boucher, Appellant.

No. 46897.

November 12, 1946.

White & White, of Harlan, and Welch & Welch, of Logan, for appellant.

Jake S. More, of Harlan, and Paul McCarville and John H. Mitchell, both of Fort Dodge, for appellee.

MANTZ, J.—The action is at law, brought by Naomi Christensen, a minor, by her mother and next friend, Minnie Christensen, against Bernie Boucher, to recover damages because of his forcible defilement of her, resulting in the birth of a child to her. She alleged that said defilement was forcible and against her will and despite any resistance she could make. She claimed to have sustained actual damages in the sum of $25,000. The defendant denied all of the allegations of plaintiff's petition both generally and specifically. The jury returned a verdict in favor of plaintiff and against defendant for the sum of $25,000.

Defendant moved the court to set aside the verdict of the jury and to grant a new trial. The court ordered plaintiff to file a remittitur in the sum of $10,000; otherwise, a new trial would be granted. Plaintiff filed such remittitur, the motion for a new trial was overruled, judgment was entered against the defendant, and this appeal followed.

Appellant relies upon three errors for reversal. None questions the sufficiency of the evidence but all relate to actions and rulings by the trial court. The errors claimed are as follows:

First: The court erred in refusing the defendant's requested Instruction No. 4.

Second: The court erred in failing to give defendant a new trial for the reason that the verdict was excessive and appears to have been influenced by passion or prejudice.

Third: The court erred in admitting testimony that McNaughton made a trip to Fort Dodge to see plaintiff and her mother, and the error was not cured by the court later giving an instruction to disregard such evidence.

Before considering these claimed errors we think that it will be helpful to briefly summarize from the record some of the incidents and events out of which this suit arises. Due to the length of the record and the fact that no question has been

raised as to the sufficiency of the evidence we will endeavor to limit our summarization.

During September 1943, Naomi Christensen, then eighteen years of age, made her home with her widowed mother at Harlan, Iowa. Her father died at Audubon in 1936. She was graduated from the Harlan High School in 1943. She took part in school activities, being a member of various musical groups therein; she was a member of the glee club, mixed chorus, sextette, marching band, and concert band. About the time of her graduation she worked in various offices at Harlan and in September 1943 was attending a business college in Omaha, Nebraska.

On September 23, 1943, she met Bernie Boucher, appellant, on the streets of Omaha, and by mutual arrangement she and Betty Hansen, a girl friend from Harlan who was attending the Omaha school, rode in Boucher's automobile from Omaha to Harlan. M. F. McNaughton, an employee of Boucher, was also a passenger on the trip.

Bernie Boucher was forty-six years old, had a wife and three children, and for several years had operated a sort of night-club café known as the "Chicken Hut" on the outskirts of Harlan.

The party ate supper at the Mexicali Café in Omaha and then drove directly to Harlan, arriving there somewhere around 9:30 to 10 p. m. Naomi claimed that Boucher stopped at the chicken hut for the purpose of leaving some supplies and then drove into town and let McNaughton and the Hansen girl out and then, over her protests, drove out of Harlan westward on the paved highway and then turned north onto a dirt road and in an unfrequented spot stopped the car and solicited sexual intercourse with her; that she refused and, despite her refusal and over her resistance, Boucher forcibly ravished and debauched her; that the parties were in the front seat and in the struggle her head came forcibly in contact with the steering wheel, causing her to become unconscious; that when she regained consciousness she was alone in the front seat, her clothing disarranged and torn, and she was bleeding and suffering pain in her private parts; that later Boucher came from behind the car and drove her back to Harlan.

At that time, according to the evidence, Naomi weighed

one hundred eight pounds and Boucher two hundred five. Boucher had formerly operated a pool hall in Lincoln, Nebraska, and was a former professional baseball and football player. Naomi returned to Omaha and later began working for the Mutual Benefit Insurance Company and at the time she quit working, in February 1944, she was receiving a salary of $112 per month. She quit working due to the fact that an examination by a physician for the company revealed that she was pregnant. She returned to Harlan and lived with her mother; about May 22, 1944, Naomi made arrangements to go to Fort Dodge, Iowa, and enter the Lutheran Hospital and have her baby. Before leaving she had several talks with Boucher in which he was advised of her condition. Boucher gave her $200 to be used to defray her expenses, and then arranged to have an employee of his take her to the train headed for Fort Dodge, she taking the train at Irwin, Iowa. Boucher claimed that the $200 was a loan and nothing more and was given to help her out. As a witness Boucher positively denied having had intercourse with Naomi and stated that on their return from Omaha he and McNaughton let the two girls off at the chicken hut, where they remained for a time and were then taken away in his car by an employee, Mrs. Hoover.

Naomi went to Fort Dodge and entered the Lutheran Hospital and on June 2, 1944, a male child was born to her. About the twelfth day following the birth Naomi became seriously ill, her left side became paralyzed, and convulsions followed, in which her body jerked and twitched and her eyes rolled. Special nurses were placed on the case, hypodermics were administered, and some ether and penicillin treatment followed. She remained in the hospital approximately five weeks and was then taken to a tourist cabin in Fort Dodge. There she remained about two months, being nursed in part by a regular nurse and in part by her mother, a practical nurse. While there she was able to get up a little but had little use of her left leg and arm. Later she was put on the train and taken to the home of an aunt at Omaha, where she stayed the last few months of 1945. There is in the record evidence that as a result of the birth of the child and the illness that followed she suffered permanent injuries.

Following a demand on Boucher that he pay Naomi's ex-

penses for loss of time and damages, which demand was refused, this suit was brought. This is the second trial. In the first, the jury disagreed.

I. The first error set forth and argued by appellant relates to the refusal of the trial court to give requested Instruction No. 4, which is as follows:

"The claim made by the plaintiff in this case, if true, would constitute a criminal offense. In this connection the law presumes that the defendant is innocent of the acts claimed and this presumption is evidence in his favor. This presumption of innocence continues at all stages of the proceedings until overcome by a preponderance of the evidence and there is no duty or burden on the part of the defendant to prove himself innocent of the claim made by the plaintiff."

The action is at law and for damages claimed to have been suffered by appellee by reason of her having been forcibly defiled and debauched by appellant on September 23, 1943, resulting in her pregnancy, and later, in the birth of a child. The petition does not ask damages for any crime; it simply prays for damages for the illegal act on appellant's part. It is too well settled to require citation of authority that to recover in a civil case the party making claim for damages has the burden of establishing such claim by a preponderance or greater weight of the evidence. In the present case, appellee had such burden and the trial court so charged in two different instructions. We set out Instruction No. 4 in full:

"It is alleged in the petition of the plaintiff that the defendant with force and violence and against her will made an assault upon plaintiff and defiled and debauched her person and had carnal knowledge of it. This allegation in the petition amounts to a claim that the defendant had sexual intercourse with the plaintiff by means of force and violence, against her will and without her consent. In order for the plaintiff to recover under this allegation, she must establish by a preponderance or a greater weight of the evidence, as defined in these instructions, that the defendant did have sexual intercourse with her by force and violence or against her will, and without her consent."

This same burden was likewise referred to in Instruction No. 6. Appellant did not object or take exception to either of these two instructions.

In argument, in support of his claim that the court's refusal to give requested Instruction No. 4 was error, appellant cites the case of Ohlson v. Sac County Farmers Mut. F. Ins. Assn., 191 Iowa 479, 481, 182 N. W. 879, 880. That case was a suit to collect a claimed loss by fire under a policy held by assured decedent. There the defendant made the claim that the assured had set fire to the insured building; in other words, that in setting fire to the building assured had committed the crime of arson. The plaintiff requested an instruction which stated that in a charge of this kind " 'a natural presumption of innocence exists,' " and further, that the jury may properly consider the improbability that one "will commit an act of a criminal nature."

The trial court refused to give the requested instruction and on appeal this action was affirmed. In the opinion, Weaver, J., speaking for the court, discussed the matter involved in the requested instruction. We quote a part thereof:

"Counsel on either side have gone deeply into discussion of the law with respect to the force and effect of presumptions in the trial of an issue of fact. We deem it unnecessary, in this case, to attempt any final answer to this more or less vexed question, upon which some modern law writers and courts have expended (or wasted) a vast amount of learning, without shedding upon it any appreciable degree of light. We are not disposed, at this time, to go the length insisted upon by counsel for appellee, and hold that a presumption is *never* 'evidence of anything.' We have often held otherwise. But it does not follow that our rejection of such broad contention requires or justifies us in holding that the trial court erred in refusing the requested instruction in this case. It is not always advisable or permissible for the trial court to instruct a jury upon abstract legal principles. To do so tends often to obscure the question of fact on which the jury is to pass, and thus serves to mislead, rather than aid, the triers of fact in reaching a just conclusion. There are presumptions and presumptions. It has been said

that 'presumptions, like probabilities, are of different degrees of strength.' "

In written argument, appellant refers to the Ohlson case, supra, as not applicable, and uses the following language:

"In the Ohlson case, which was decided by this court in 1921, an instruction similar to the one requested here was refused. It is our contention that the Ohlson case is not controlling here for the reason that there is no presumption such as the chastity presumption here to be counter-balanced."

It is somewhat difficult to follow appellant's theory at this point. The language above quoted seems to suggest that inasmuch as the trial court in the present case stated that appellee was presumed to be of chaste character, then, to counter-balance that statement, the jury should have been advised that appellant was presumed innocent of the crime of rape of appellee. It seems to us that appellant misconceives the purpose of the court in advising that appellee was presumed to be of previous chaste character. In Instruction No. 15 to the jury, dealing with the recovery, if any, to which the appellee was entitled, the trial court set out various items. One of such items was as follows:

"Such sum as in your judgment will fairly compensate her for the indignity done to her person by such an assault, for the mental suffering and humiliation, if any, caused thereby, and for such loss of society and standing as would naturally flow therefrom, if you believe from all of the evidence that such consequences are reasonably certain to result by reason of the assault having been so made upon her. It is a presumption of law that the plaintiff, being an unmarried female, was of chaste character prior to the time complained of and, if you find that she is entitled to recover, you should also take that fact into consideration in estimating her damages."

It will be seen that the trial court very properly told the jury that it might consider the chaste character of appellee in case the evidence showed that she had been forcibly defiled.

In connection with the claim which appellant makes that he was entitled to have requested Instruction No. 4 given, we call attention to the case of Lilienthal's Tobacco v. United States, 97·

U. S. 237, 266, 267, 24 L. Ed. 901, 905. This was a suit for unpaid taxes arising, it was claimed, by the taxpayer's violating the law and in failing to make proper returns. It was claimed that there were involved therein fictitious sales made for the purpose of defeating the tax. Under the revenue act, certain facts being shown, the burden was cast upon the taxpayer to defend against said situation. In the course of the discussion the court had occasion to discuss the differences of proof required as between civil suits and criminal actions, and in so doing said:

"In criminal cases the true rule is that the burden of proof never shifts; that in all cases, before a conviction can be had, the jury must be satisfied from the evidence, beyond a reasonable doubt, of the affirmative of the issue presented in the accusation that the defendant is guilty in the manner and form as charged in the indictment. [Citing cases.]

"Text-writers of the highest authority state that there is a distinction between civil and criminal cases in respect to the degree or quantum of evidence necessary to justify the jury in finding their verdict. In civil cases their duty is to weigh the evidence carefully, and find for the party in whose favor it preponderates; but in criminal trials the party accused is entitled to the legal presumption in favor of innocence, which, in doubtful cases, is always sufficient to turn the scale in his favor. 3 Greenl. Evid. (8th ed.), sect. 29; 1 Taylor, Evid. (6th ed.) 372."

In the further discussion of this matter, the court said:

"Innocence is presumed in a criminal case until the contrary is proved; or, in other words, reasonable doubt of guilt is in some cases of the kind ground of acquittal, where, if the probative force of the presumption of innocence were excluded, there might be a conviction."

We have examined the authorities cited by appellant in connection with the claim which he makes with reference to the instruction. As to abstract propositions or rules, we find no fault with them. Practically all of them were connected with criminal cases wherein there always exists the necessity of instructing on the presumption of innocence.

We hold that it was not error for the court to refuse to give the requested instruction.

II. The second error set forth was that the trial court erred in failing to grant appellant a new trial for the reason that the verdict was excessive and was influenced by passion or prejudice.

Appellee did not claim exemplary damages. She claimed actual damages in the sum of $25,000. The jury allowed her that sum. Later a remittitur of $10,000 was filed, after the court ruled that in the event of a failure to file such remittitur a new trial would be granted.

While appellant does not claim that the evidence was insufficient to sustain a verdict for some amount, yet he alleges that the verdict returned was excessive and indicated passion and prejudice. Appellant's brief contains eighty-four pages; sixty-two pages thereof are devoted to setting out certain evidence from the record. We assume that the setting out of so much of the record was for the purpose of showing the excessiveness of the verdict.

Appellant caused all of the jurors to be examined under oath in an attempt to show that they were influenced by passion and prejudice. Without holding that passion and prejudice may be shown in this manner, and without approving the procedure here followed, we may observe that the examination of the jurors failed to disclose any passion or prejudice.

In this case appellee's claim is based on appellant's forcibly defiling her, with a net result that she became pregnant and gave birth to a child under difficult conditions; that she will need a further operation or operations; that she is permanently injured, and that she has been humiliated, shamed, disgraced, and chagrined and has lost standing in society; that her damages were mental as well as physical.

The trial court, as a guide to the jury on the question of damages, gave the jury Instruction No. 16, which is as follows:

"The plaintiff's recovery for each of the above-named items of damages cannot exceed the amount established by the evidence and cannot exceed for the hospital expenses already incurred the sum of $257.45; for medical services the sum of

$159.00; for nurses, $153.00; and for rental of a tourist cabin at Fort Dodge, Iowa, the sum of $87.50; and for future hospital expense, including operating room, $110.00; for physicians and surgeons, $150.00; and for pain and physical and mental suffering, loss of time, indignity done to her person as a result of such assault, if any, and for such loss of society and standing, and humiliation flowing therefrom, if any you believe there to be, and her recovery in the aggregate [amount] cannot exceed the sum of $25,000.00.''

No exception was taken by either party to this instruction.

During a part of the time appellee attended the Harlan High School she did some outside work, largely clerical. She worked in the office of Professor Finn, the high-school principal; in the civilian defense office, under the supervision of George Hurley, an attorney at Harlan; and for a time as office secretary for the law firm of White & White at Harlan. There is nothing in the record tending to show that her morals or character were other than good; she moved in good circles and participated in local social affairs. After graduating from high school she went to Omaha and there entered a business college; later she secured a position with an insurance company, where her wages were increased from time to time, and ceased work there when an examination revealed she was in a pregnant condition. Thereupon she returned to Harlan and went to live with her mother.

During the latter part of May, using money supplied by appellant, the appellee went to the Lutheran Hospital at Fort Dodge, and there on June 2d a baby was born, with Dr. Acher in charge. Following the birth of the baby all was normal until about the 16th of June 1944, when her left side became paralyzed and in a short time she went into convulsions. These convulsions lasted from six to seven minutes and occurred several time a day. Dr. Acher called Dr. Bruce in consultation. During convulsions her body jerked and twitched and she had no control over it; her eyes would roll. Hypodermics were given, also ether and penicillin. Special nurses were placed on the case. She stayed in the hospital about five weeks, after which she was taken to a tourist cabin. The paralysis con-

tinued for over three weeks after she was taken from the hospital.

The baby was born as the result of forced labor. She had a nurse at the tourist cabin. She was unable to walk when she left the hospital and she was in bed at the tourist cabin for about two months. During this time she was unable to use her left arm and regained some slight use of the left leg.

The record shows that prior to the time appellee entered the hospital at Fort Dodge she had never had illness of any kind.

Dr. Acher, a physician of thirty years' experience in Fort Dodge, described appellee's condition at the birth of the child; the labor was difficult; her cervix was lacerated, and there was a laceration of the perineum, and repair work was done which became infected, making it necessary to catheterize her; that she was nervous, suffered pain, became partially paralyzed, and had convulsions, and he stated that in his opinion her injuries were permanent. He further testified that appellee would be compelled to undergo further surgical attention to relieve her ailment.

The special nurses who attended appellee in the hospital and also at the tourist cabin, testified as to her condition: the convulsions, paralysis, the drawn face, with the body twitching and jerking, the chloroform method to treat convulsions; that she appeared to suffer pain and cried a great deal. The record shows that up to the time of the trial in November 1945 appellee had not been able to work and still suffered from the effects of the childbirth.

Summed up, the rule seems to be that a verdict, of a jury is not to be considered excessive unless it should shock the judicial conscience.

It is not a question of what this court would have allowed were we triers of the facts. It was the right, the duty, and the obligation of the jury to fix the verdict.

In passing upon appellant's claim that the verdict is excessive we think that, in addition to the evidence passed upon by the jury, consideration may properly be given to the lessened purchasing price of money.

With the above rule in mind, we can with profit reread

and reconsider the part of the record above set forth. Appellee set forth her claim; the jury by its verdict placed its seal of approval thereon. Taking into consideration the record herein, we are unable to say as a legal or moral proposition that the verdict was excessive. The sums which appellant has been required to pay are substantial. The unwarranted and uncalled for act on the part of appellant has cast a lifelong mantle of shame over the life of appellee. She has suffered shame, disgrace, and humiliation, and the future can never erase from her mind the ordeal from which she suffered. A jury saw the parties, heard the witnesses, and on their separate oaths declared that they abided by the evidence. It is not for this court to say that they had no right to do as they did. Under the record in this case we cannot say that their verdict was so excessive as to indicate passion and prejudice or to shock the conscience.

The question as to whether a given verdict is excessive has been before this court many times. We shall not attempt to analyze the decisions. Therein are set forth the rules to be followed in such cases. We will cite the following: Darland v. Wade, 48 Iowa 547; Boyle v. Bornholtz, 224 Iowa 90, 275 N. W. 479; Brause v. Brause, 190 Iowa 329, 177 N. W. 65; Hall v. Chicago, B. & Q. Ry. Co., 145 Iowa 291, 122 N. W. 894; Ideal Cream S. R. Works v. City of Des Moines, 167 Iowa 517, 149 N. W. 640; Reutkemeier v. Nolte, 179 Iowa 342, 161 N. W. 290, L. R. A. 1917D, 273; 4 C. J. 869, section 2846 et seq., 5 C. J. S. 640, section 1650 et seq.; Saunders v. Mullen, 66 Iowa 728, 24 N. W. 529; Quenrud v. Moore-Sieg Constr. Co., 191 Iowa 580, 181 N. W. 16; Albrook v. Western Union Tel. Co., 169 Iowa 412, 150 N. W. 75; Pekarek v. Meyers, 159 Iowa 206, 140 N. W. 409; Hobson v. New Mexico & A. R. Co., 2 Ariz. 171, 11 P. 545; Palmer v. Cedar Rapids & M. C. R. Co., 124 Iowa 424, 100 N. W. 336; 15 Am. Jur. 620–623, sections 204, 205.

III. The final ground for reversal set forth by appellant relates to certain evidence in the record of a trip made by M. F. McNaughton, an employee of appellant, to Fort Dodge, Iowa, wherein McNaughton called upon appellee at a tourist cabin where appellee and her mother were staying

following the time appellee left the Lutheran Hospital after giving birth to the baby. The evidence as to this trip was brought out in the examination of various witnesses, including appellee and her mother. Some of such evidence was admitted and some excluded. Appellant moved the court to exclude all of such evidence.

When the court instructed the jury there was given to that body what was known as Instruction No. 9. This instruction is as follows:

"Certain testimony was given during the trial relative to a trip made by M. F. McNaughton to Fort Dodge in the defendant's automobile and a conversation related between said M. F. McNaughton and the plaintiff in said city. This evidence has been stricken from the record in this trial and is not to be considered by you in deliberating on your verdict, and is not to be taken as an admission on the part of the defendant of any liability in this case."

The record shows that when the appellee, Naomi Christensen, was on the witness stand and near the close of her examination, the appellant's counsel, Mr. Cullison, dictated into the record the following:

"Now, if the court please, the defendant at this time moves the court to strike from this record all of the evidence relating to any visit from Mr. M. F. McNaughton to the plaintiff or her mother, and any and all conversation had with said parties in Fort Dodge, Iowa, at the time related by the witness, for the reason that it is now apparent that said visit and the discussions had thereon were all for the purpose of a settlement of this case and other cases then contemplated and now pending, and that the law favors a settlement; *and request that the jury be instructed in substance that the law favors a settlement and that no act or conduct or conversation on the part of the said M. F. McNaughton and the witness is to be in any way construed by them as an admission of any liability or responsibility for any of the acts claimed by the plaintiff in her petition."* (Italics supplied.)

We will set out the specific language of the claim which appellant makes in his assignment of error. It is as follows:

"The court erred in admitting testimony that McNaughton made a trip to Fort Dodge to see the plaintiff and her mother, and the error was not cured by later giving an instruction to disregard."

In essence, appellant's claim is that the evidence offered and stricken was so damaging and prejudicial that the jury was influenced thereby in the face of the court's admonition that they were not to consider such stricken evidence. Inasmuch as appellant has laid considerable stress upon this proposition, we deem it advisable to consider parts of the record bearing thereon.

M. F. McNaughton, aged forty-three, was an employee of appellant from about August 1943 down to the time of the trial. He was with appellant and the two girls on the trip from Omaha on September 23, 1943. Appellee went to Fort Dodge to enter the Lutheran Hospital there during the latter part of May 1944. She testified that before she went there she had several talks with Boucher, and in them she informed him of her condition and the necessity of her going to a hospital. She testified that she and Boucher discussed her condition and the probable cost and that she told him that the cost would be considerable and that Boucher then gave her $200 and told her that if she needed more to write him, sending the letter in care of a Mr. Whitehill, of Harlan. Boucher admitted that Naomi advised him of her trouble and that to help her out he loaned her the $200. He absolutely denied the claim of appellee that he was responsible for her condition and stated that as a friend he was helping her out.

On June 2, 1944, the child was born. On June 7, 1944, Naomi wrote appellant, sending the letter in care of Mr. Whitehill, and in this letter mentioned her condition, the expenses she had incurred and others to be incurred, and stated therein that the $200 given her would not pay her expenses and that she felt he should pay her $1,500 for expenses and damages; otherwise, she would take the case into court. No answer was received to this letter. In a few weeks, and while Naomi was

in a tourist cabin in Fort Dodge and was being nursed by her mother, McNaughton came to see her. He came there in Boucher's automobile—the same one used on the trip from Omaha. He stayed about an hour and while there visited Naomi and her mother. The subject of discussion and the discussion, upon objection of appellant, were excluded. Upon the cross-examination of appellee the appellant produced the letter written by appellee to appellant on June 7, 1944, caused same to be marked as an exhibit, and introduced the same in evidence. Appellee was questioned at length as to the letter, its purpose, and the circumstances under which it was written. Special emphasis was placed upon the letter as constituting an offer of settlement. Further, in cross-examination, the appellee was interrogated as to the visit of McNaughton; conversations with him regarding the purposes of his visit; the condition of the appellee; the claims of appellee that Boucher was responsible for her condition; that McNaughton talked over such matters with both appellee and her mother; that McNaughton wanted to know what appellee meant by the letter to Boucher; that McNaughton said that he would return to Harlan and talk matters over with Boucher. On redirect examination appellee testified as to the McNaughton visit to Fort Dodge and in it McNaughton stated to her and her mother:

"He just said he didn't come up to make a settlement; he had to hear what we had to say and then go back [and talk] to Mr. Boucher."

It is quite evident from the record that the cross-examination of appellee went much further than her direct examination. In the direct, appellee told of McNaughton's coming to the tourist cabin in Boucher's car and talking to her and her mother. Details of that talk were prevented because of objections of appellant. On cross-examination appellant produced and offered in evidence appellee's letter to appellant wherein mention was made of a settlement. Also, on cross-examination, some of the details of the talk between McNaughton on the one side and appellee and her mother on the other side were gotten into the record.

Later, upon motion of appellant, all the evidence as

to McNaughton's visit was stricken, and appellant in addition requested the court to instruct the jury almost along the same line as was given by the court.

Assuming for the purposes of this appeal that the court was right in striking from the record all evidence therein relating to the trip of McNaughton to Fort Dodge to see appellee, yet we are unable to see wherein such helps appellant. Appellant requested an instruction along the same line as the one given by the court. This request was included in the motion to strike all of the evidence as to such trip by McNaughton. The jury was duly instructed and no exception was taken to Instruction No. 9. It will be presumed that the jury followed the court's instructions in that matter. Many Iowa cases might be cited in support of the foregoing statement: Mitchell v. Des Moines City R. Co., 161 Iowa 100, 141 N. W. 43; Spiker v. City of Ottumwa, 193 Iowa 844, 186 N. W. 465; McKee v. Iowa Railway & Light Co., 204 Iowa 44, 214 N. W. 564; Friedman v. Colonial Oil Co., 236 Iowa 140, 18 N. W. 2d 196. In the case of McKee v. Iowa Ry. & Lt. Co., supra, this court held that it will be presumed that the jury followed the court's admonition not to consider stricken evidence. See, also, Ayers v. Hartford Ins. Co., 21 Iowa 193; Ryerson & Son v. Roth .Bros. & Akers, 210 Iowa 1179, 232 N. W. 500.

In addition to such presumption we have a record made by the appellant which shows that the jury did follow the instructions of the court. In support of the motion to set aside the verdict and grant a new trial appellant alleged that the testimony concerning the trip of McNaughton to visit appellee at Fort Dodge "was considered by the jury and discussed in the jury room and that the verdict of the jury was based thereon."

Upon request of appellant all of the twelve jurors were called in and examined under oath as to some matters alleged to have happened in the jury room during the time the jury was deliberating on the case. It seems to the court that in some instances some matters were inquired into which were not proper or legitimate subjects of inquiry. Some of the inquiries seemed to follow a technique sometimes designated as a "fishing expedition." We might suggest that in proper cases

jurors may be interrogated as to things which may have happened in the jury room. Still, there are, and should be, limits to such examination. It seems to us that some of the examination went beyond the proper sphere. The jurors, without exception, stated that they decided the case on the evidence before them; that they followed the court's instructions. Several of them stated that, while there was some mention made in the jury room of the McNaughton trip, yet they followed the instructions of the court and disregarded it. Taking the record which was made at the request of appellant, we think it shows clearly and fairly that the jury obeyed the court's instructions to disregard all evidence growing out of the McNaughton trip. As we read the record, a large part of the evidence of which appellant complains regarding the trip of McNaughton was brought out on the cross-examination of appellee. We might further add that some parts of that cross-examination dealt with matters which had been objected to and objections sustained in the direct examination of appellee. We find no error here.

Taking the record, we find no reversible error therein and the case is affirmed.—Affirmed.

GARFIELD, C. J., and SMITH, BLISS, HALE, WENNERSTRUM, and OLIVER, JJ., concur.

HAYS, J., takes no part.